542 A.2d 519

**Edward M. LEWIS, Appellant,**

v.

**CIVIL SERVICE COMMISSION, CITY OF PHILADELPHIA, Appellee.**

Supreme Court of Pennsylvania.

Submitted Dec. 10, 1987.

Decided May 20, 1988.

Bruce W. Kauffman, Paul S. Diamond, Richard J. Bortnick, Philadelphia, for appellant.

Ralph J. Teti, Divisional Deputy City Sol., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

The issue presented in this case is whether findings of the Civil Service Commission (the Commission) were supported

by substantial evidence in its decision to uphold appellant's discharge from the Philadelphia Police Department.

The record of the proceedings before the Commission discloses the following. In February of 1982, the Philadelphia Police Department (the Department) began an investigation to identify which police officers were responsible for excessive interference with police car radio broadcasts in its North Central Division. This interference primarily occured in the form of "clicking" when officers pressed the transmission switch on their microphones. The Department considered the interference to be potentially life threatening because it prevents legitimate transmissions from being broadcast.[1] The purpose of the investigation was to curtail this improper use of police radio by surreptitiously catching an offender and making a disciplinary example of him.

The Department's plan was to install a silent secondary broadcast system or "channel guard radio" to replace the existing radio in randomly selected police vehicles. The channel guard radio would enable the Department to monitor and record radio transmissions from a particular police vehicle because it gives off a subaudible tone making the receipt of that radio's output distinctive from other transmissions. In this case, the output went into a relay system where it was electronically recorded.

On February 9 and 10, 1982, appellant Edward M. Lewis was on duty in radio patrol car 227 during the 11:30 p.m. to 7:30 a.m. shift. Unbeknownst to Officer Lewis, the radio normally in car 227 was replaced with the channel guard radio. During this time, the department taped clicking noises and an inaudible shout on February 9, and clicking noises on February 10, allegedly emanating from the channel guard radio in patrol car 227.

1. Officers clicked their radios to respond to or applaud another officer's remarks. They were also in the habit of pressing the transmission switch on their microphones in order to get feedback and test their radios. Although this was the customary method used by the officers in the North Central Division to check the functioning of their radios, the prescribed method was to identify yourself and ask the dispatcher for a check.

The channel guard tape gave no indication of the exact time of the interference but merely the shift during which the transmissions occurred. Therefore, the department secured a master tape from police radio dispatch of all radio transmissions and computer printouts showing the times of various assignments broadcast from the dispatch center on these dates. Mr. Connors, a civilian police communications dispatcher, compared the channel guard tape with the master tape to locate the "clicking" on the master tape. Using the times from the computer printouts for a reference point, he then placed the master tape on a tape reader that was equipped with a digital clock to determine the exact time of the channel guard transmissions. Mr. Connors prepared an edited version of the master tape on which he narrated the exact time of the interference. This re-recording contained only selected portions of transmissions from the master tape. After ten days the master tape was erased and reused.[2] Finally, a transcript of the edited tape was prepared by Mr. Connors indicating that the interference occurred at 2:49 a.m. on February 9, 1982 and at 3:03 a.m. on February 10, 1982.

Next, an interview was conducted by Sergeant Cannon of the Internal Affairs Bureau during which Officer Lewis admitted that he was in his car and was ready for service at 2:50 a.m. on February 9 after returning from the North Central Detectives Division building. This was approximately one minute after the alleged interference on that date as indicated by the edited tape and transcript. Officer Lewis also stated that he was in his vehicle at approximately 3:00 a.m. on February 10 and was in the process of checking his radio before leaving his vehicle to issue a traffic citation to a taxi cab driver. Following the interview, Officer Lewis, a fourteen year veteran of the Department, was discharged for disobedience of orders, neglect of duty and conduct unbecoming an officer for intentionally interfering with police radio broadcasts.

2. It was a practice in the department to erase master tapes and reuse them after ten days.

Officer Lewis appealed his discharge to the Civil Service Commission. At the hearing before the Commission, the Department offered as evidence both the channel guard tape and the edited version of the master tape, along with the transcript prepared therefrom. This evidence was admitted by the Commission which relied soley upon it in finding that Officer Lewis intentionally interfered with police radio broadcasts and thus, the Commission upheld Officer Lewis' discharge.

Officer Lewis appealed his discharge to the Philadelphia Court of Common Pleas. No new evidence was presented and, on October 31, 1984, the trial court reversed the decision of the Commission. The trial court held that the admission of the edited tape was improper and that, without the tape, substantial evidence did not exist to support Officer Lewis' discharge. Thereafter, the Department appealed the order of the trial court to the Commonwealth Court, arguing that appellant had failed to object to the introduction of the tape at trial. The Commonwealth Court reversed the order of the trial court on the grounds of waiver and reinstated appellant's dismissal. We granted allocatur and we now reverse.

■ Appellate review of an adjudication of a municipal civil service commission is limited to determining whether constitutional rights have been violated, an error of law has been committed or findings of fact neccessary to support the adjudication are not supported by substantial evidence. 2 Pa.C.S.A. § 754(b). *See also, Tegzes v. Township of Bristol,* 504 Pa. 304, 472 A.2d 1386 (1984). In this case we are required to view the evidence in the light most favorable to the Department as the party in whose favor the Commission has ruled, giving it the benefit of all reasonable inferences. *Penn Hills School District v. Unemployment Compensation Board of Review,* 496 Pa. 620, 437 A.2d 1213 (1981).

■ In this appeal Officer Lewis argues: 1) that his

dismissal was unprecedentedly harsh;[3] 2) that the admission of the edited master tape was improper; and 3) that there was not substantial evidence to support his dismissal. We agree that Officer Lewis' dismissal was not supported by substantial evidence and, accordingly, we do not reach the other issues.

 Police officers, as civil service employees, can be removed from employment only upon a showing of "just cause". 71 Pa.C.S. § 741.807. The function of an appellate court in reviewing the discharge of a civil service employee is to ensure that just cause for dismissal exists both factually and legally. *In re Baker's Appeal*, 409 Pa. 143, 185 A.2d 521 (1962). We do this under the rubric of the substantial evidence rule.

Substantial evidence has been defined as "such relevent evidence as a reasonable mind might accept as adequate to support a conclusion". *Clites v. Township of Upper Yoder*, 506 Pa. 349, 354, 485 A.2d 724, 726 (1984). "Substantial evidence is more than a scintilla and must do more than create a suspicion of the existence of the fact to be established." *Pennsylvania State Board of Medical Education and Licensure v. Schireson*, 360 Pa. 129, 123, 61 A.2d 343, 346 (1948).

 It is clear that the evidence submitted by the Department in this case did no more than raise a suspicion that Officer Lewis intentionally interferred with police radio broadcasts. The Commission made specific findings that the interference emanated from patrol car 227, was trans-

---

3. Appellant has waived this argument. Generally, "a party who proceeded before a local agency ... may not raise upon appeal any other question not raised before the agency ... unless allowed by the court upon due cause shown". 2 Pa.C.S.A. § 703. *See also, Borough of Middleton v. Pennsylvania Public Utility Commission*, 143 Pa.Super. 444, 17 A.2d 904 (1941). While appellant was not required to raise new issues in the City's appeal to the Commonwealth Court, he waived the argument by not raising it before the Commission. He also failed to raise the issue in his appeal to the trial court. Lewis' only effort to argue what we consider a meritorious issue was after it was raised by Judge Kadish in his dissent to the majority opinion of the Commonwealth Court. In any event, this issue is moot given our disposition of the case.

mitted by Officer Lewis and was intentional. No direct evidence was submitted in this regard, but the Department attempted to prove these facts through circumstantial evidence.

Concerning circumstantial evidence this court has previously stated:

All circumstantial evidence is based in part upon "positive" or direct evidence, ... The circumstances from which the major fact in issue is to be inferred have to be proved chiefly by testimonial or positive evidence. If the so called "positive" evidence is erroneous or merely conjectural, no reliable inference can be drawn from it.

*Commonwealth v. New*, 354 Pa. 188, 194, 47 A.2d 450, 454 (1946). In order to create an inference that the interference was transmitted from Officer Lewis' patrol car it was incumbant upon the Department to show through direct evidence that the channel guard system recorded transmissions exclusively from patrol car 227. This was not accomplished.

First, Seargent Aquino testified, as a witness for the Department, that if an officer using the channel guard radio keyed his microphone and thereby left his transmitter open at the same time that a second officer was transmitting, it would be possible for the second officer to transmit through the channel guard system. Sergeant Aquino testified that the Department had previous problems with the channel guard radio's low output. He explained that if two officers were transmitting simultaneously the system would filter out the weakest of the signals, in this case, the channel guard transmission. Thus, that which was recorded on the channel guard tape would have been from another radio, located in another car. This testimony was corroborated by Officer Lewis' expert, Mr. Short, an electrical engineer, and manager for General Electric Communications.

Second, the transcript of the edited tape shows that other instances of improper clicking and interference, very close in time to the improper transmission from car 227 on

February 9, at 2:49 a.m., had taken place and were recorded on the master tape but were not from the channel guard radio. For example, at approximately 2:48 a.m. on that date, the transcript of the edited master tape shows a non-channel guard transmission of clicking and the words "pushy, pushy". Under these circumstances, the transmissions from other radios may well have overridden the channel guard transmissions from car 227 and been inaccurately attributed to the radio in that car. Whether other instances of improper interference occurred is unknown since the master tape was erased.[4] Because of the deficiency in the channel guard system, and the fact that other instances of nonchannel guard interference were indicated on the edited tape, no reliable or reasonable inference could have been drawn that the channel guard system recorded transmissions exclusively from the radio in Officer Lewis' patrol car.[5]

Commission further found that the interference was transmitted by Officer Lewis because he admitted that he was the only one with access to car 227 on February 9 at

4. The Department claims that it erased the tape in the ordinary course of business because it did not anticipate litigation. The Commission accepted this excuse even though the charges against Officer Lewis were brought within the ten day period during which the tape would have ordinarily been saved. We fail to see the Department's reason for taking the trouble to reproduce an edited version of the master tape and, at the same time destroy the master tape as a matter of course, when it provided the only method for determining the exact time of interference. By erasing the master tape the Department prevented Officer Lewis's expert from verifying the test done by Mr. Connors or from conducting his own test of the time of interference.

5. Additionally, without contravening our scope of review we note that Mr. Short opined that the transmission on February 9, at 2:49 a.m. during which Officer Lewis allegedly clicked his radio and shouted an inaudible word was not from the channel guard radio. He determined this by making voice prints of the channel guard transmission on an oscilloscope. Mr. Short compared other transmissions from the channel guard tape in which Officer Lewis identified himself in some manner with the alleged improper transmissions. The voice print of the channel guard transmissions showed a continuous dark line of the same intensity. This continuous dark line was not present on the voice print of the transmission of February 9, at 2:49 a.m. and thus, could not have been transmitted from Officer Lewis' vehicle. This evidence was uncontradicted by the Department.

2:49 a.m. and on February 10 at 3:03 a.m. There is no support in the record that Officer Lewis admitted that he was in his patrol car at 2:49 a.m. on February 9, as the Commission suggested in its opinion. In his interview with Sergeant Cannon, Officer Lewis stated that he was in his vehicle and ready for service at 2:50 a.m. on that date. This was approximately one minute after the time of interference.[6]

Finally, concerning the clicking that was recorded on February 10, Officer Lewis did admit that he was in his vehicle at approximately 3:00 a.m. and was in the process of checking his radio. However, there was no record evidence to support the Commission's finding that Officer Lewis intended to interfere with police radio broadcasts at that time, nor can any such inference be drawn. Officer Lewis stated that at approximately 3:00 a.m. he had pulled over a taxi cab driver for a traffic violation in the 1600 block of Lehigh Avenue. Before leaving his vehicle to issue the traffic citation he turned on the outside speaker of his radio in order to be able to hear broadcasts from his radio. Since it was early in the morning, he did not want to disturb the neighborhood and tested the volume of the outside speaker by pressing the transmission switch and blowing into the microphone to achieve an appropriate volume. This manner of testing one's radio, although in disregard of Departmental directives, was a habit of officers in the North Central Division and could hardly be characterized as an intentional act of interference.

Although this is an administrative case, the principles expressed in the criminal context are useful. Wholly cir-

---

6. Moreover, Officer Lewis testified at the hearing, that after leaving the North Central Detectives Division Building he discovered that his patrol car was not in the parking space where he had left it but had been moved by another officer or Department employee. He had parked his car near the walkway to "prisoner lock-up" because the parking lot was full. He stated that it was common for police vehicles to be moved when the parking area became congested. The two men in charge of the cell block and gas pumps had keys to all the vehicles. Officer Lewis' car was unlocked because its electronic door locks were not working. This would suggest that he was not the only one with access to car 227.

cumstantial evidence may sustain a criminal prosecution but a conviction may not be based upon mere surmise or conjecture. *Commonwealth v. Thomas,* 465 Pa. 442, 446–447, 350 A.2d 847, 849 (1976). When competing inferences can be drawn from the same set of circumstances "a jury must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or liberty". *New,* 354 Pa. at 221, 47 A.2d at 468 (1946).

▇ In this case, the fact finder has erected fallacious inferences upon fallacious inferences in order to conclude that the transmissions were made from patrol car 227, at the times indicated, by no-one other than Officer Lewis. We would be remiss to sustain the conviction of a criminal defendant on such paltry evidence and refuse to do so in this case and thereby, divest a man of his livelihood. Minimally, we would expect a police department to conduct a thorough investigation by gathering sufficient competent evidence and safeguarding that evidence whether the investigation is focused on criminal conduct or the misconduct of a fellow officer. The evidence gathered and presented in this case was too thin a line on which to balance the discharge of a veteran of the Philadelphia Police Department, with an exemplary record, who risked his life each day for fourteen years to protect and defend the citizenry of our Commonwealth.[7]

Since the findings of fact of the Commission were not supported by substantial evidence we reverse the order of the Commonwealth Court and reinstate Officer Lewis with

7. Although Officer Lewis has waived the issue of excessive punishment, *See* note 3. *supra.,* it is apparent that the punishment of discharge is manifestly disproportionate to the charge of two isolated instances of improper interference with police radio, which the Department attributed to Officer Lewis, who otherwise had a long and distinguished police career. *See, Borough of Bristol v. Downs,* 48 Pa.Cmwlth. 46, 409 A.2d 467 (1979) (permanent reduction in rank and suspension was an abuse of discretion where the offense charged was a technical violation of the officer's official duties).

full back pay, all accured pension benefits and all emoluments of office.

NIX, C.J., concurred in the result.