PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

CARMEN LEVERETTE,
                    *Plaintiff-Appellee,*

           v.

MARGARET BELL, in her individual
capacity,
                    *Defendant-Appellant,*

           and

SOUTH CAROLINA DEPARTMENT OF
CORRECTIONS,
                    *Defendant.*

No. 00-1407

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Matthew J. Perry Jr., Senior District Judge.
(CA-99-501-3)

Argued: December 8, 2000

Decided: April 13, 2001

Before WILKINSON, Chief Judge, and WILKINS and
KING, Circuit Judges.

---

Reversed and remanded by published opinion. Judge King wrote the
opinion, in which Chief Judge Wilkinson and Judge Wilkins joined.

---

## COUNSEL

**ARGUED:** Vance Earle Drawdy, HAYNSWORTH, BALDWIN,
JOHNSON & GREAVES, L.L.C., Greenville, South Carolina, for

Appellant. James Lewis Cromer, CROMER & MABRY, Columbia, South Carolina, for Appellee. **ON BRIEF:** Scott Timothy Justice, HAYNSWORTH, BALDWIN, JOHNSON & GREAVES, L.L.C., Columbia, South Carolina, for Appellant. Edward C. Boggs, CROMER & MABRY, Columbia, South Carolina, for Appellee.

## OPINION

KING, Circuit Judge:

Plaintiff Carmen Leverette, an employee of South Carolina's Wateree River Correctional Institution ("WRCI"), brought this suit against Margaret Bell, the Associate Warden of WRCI, alleging that Bell had violated her Fourth Amendment right against unreasonable searches and seizures by conducting a visual body cavity search of Leverette's person. Leverette seeks damages pursuant to 42 U.S.C. § 1983. Along with her § 1983 claim, Leverette advanced a common-law negligence claim against the South Carolina Department of Corrections ("SCDC"). Upon the defendants' motion for summary judgment, the district court rejected Bell's assertion of qualified immunity, and that assertion is the sole issue before us in this interlocutory appeal. Because we conclude that the challenged search was constitutionally permissible, we reverse the denial of summary judgment and remand so that judgment may be entered in Bell's favor.

### I.

### A.

Leverette was hired by SCDC as a correctional officer in December 1990, and she transferred to the WRCI facility in 1992. In April 1998, she was promoted from correctional officer to program assistant, a non-uniformed position that she continues to occupy. Prior to her promotion, Leverette had been subjected to two strip searches, both of which were authorized by John Carmichael, Warden of WRCI, pursuant to the prison's efforts to interdict drugs and other contraband. The first such search was conducted in 1996, after an SCDC drug dog reacted to scents in Leverette's vehicle during a random search of all

vehicles entering WRCI; that search, consisting of a strip, squat, and cough, was conducted by Bell and two female correctional officers and yielded no contraband. The second search, a visual body cavity search of Leverette, was carried out at WRCI on February 4, 1998, and is the subject of this lawsuit.

On February 2, 1998, a WRCI inmate informed Bell that some of the other prisoners had schemed to buy marijuana "on the street," and that Leverette was planning to smuggle the marijuana into the prison by concealing it in a tampon. The inmate-informant, whose identity has not been disclosed, had on prior occasions provided accurate tips to the Sumter County Drug Task Force and to SCDC Internal Affairs. Based on information obtained in a meeting Bell attended with members of the Drug Task Force and Internal Affairs, she believed the inmate's information concerning Leverette to be reliable.

That evening, Bell called her supervisor, Warden Carmichael, to relay the information obtained from the inmate's tip. After the call, but prior to Leverette's scheduled return to work on February 4, Bell and Carmichael met to discuss the tip. In the course of their discussion, Carmichael directed Bell to conduct a strip search of Leverette upon the latter's arrival at work on February 4. Bell recalled raising the possibility that Leverette would be wearing a tampon and suggesting that a female medical professional be present, in light of the "personal" nature of the examination. J.A. 421. Bell further testified that no specific decision was made at that time as to what procedures to follow if a tampon were discovered.

Bell and Carmichael reconvened on the morning of February 4, in order to finalize the logistics and procedures of the search. It was then determined that the search of Leverette would be conducted in Bell's office and that a female nurse supervisor would be present, along with two female correctional officers. When Leverette arrived at WRCI to work, she was accompanied to Bell's office and advised by Carmichael that the prison had received a tip that she was carrying contraband. Before leaving the office, Carmichael stated, "[Y]ou know the procedure on this. We are going to have to do a strip search." J.A. 146-47.

Shortly after Leverette was so advised by Carmichael, the female correctional officers were beckoned to Bell's office to conduct the

search. After the warden departed, the office door was closed, the blinds were drawn shut, and Leverette began to disrobe. Bell and the officers first searched Leverette's clothing and lunch container, but they detected nothing. Leverette testified that once her clothing and lunch container had been searched, she was told that they were waiting for the nurse because, Bell stated, "[W]e are going to do a body cavity search." J.A. 149. Still naked, Leverette was seated for four or five minutes until the nurse arrived.

In her deposition, Leverette described the activities that ensued:

> I stand up and they are surround[ing] me, [the nurse] and Ms. Bell, and they are not saying anything, but I know she said body cavity search. So I kind of like bend over and they are looking. And Ms. Bell said she can't see, so I bend over a little more, and she stated she couldn't see again. So I bend over a little more, and the third time she says she couldn't see, so I just bent all the way down and put my hand on the floor so she could see. And after that they are there.

> So after I bent over I went to sit down. So they are bent down. [The nurse] she is bent down. I am opening my legs and she is looking in my vagina and Ms. Bell said they couldn't see. So I opened my legs again and Ms. Bell said she couldn't see. So I opened them a third time and opened them as far as I could get them. I said, "Ms. Bell, how far do you want me to open them?" and after that they looked, and then [the nurse] looked up at Ms. Bell and just like nod her head like everything was okay, and that was it.

J.A. 150.

After getting dressed, Leverette asked who the informant was; Bell replied that it was an inmate but declined to reveal the informant's name. Bell then left the office briefly, returning "with a consent to be strip searched and a consent to be frisk searched." J.A. 151. Leverette recalled signing the frisk search area of the form; when it was noticed that the wrong section had been signed, Leverette complied with Bell's request that she complete a written strip search consent.

Although Leverette requested a copy of the signed consent form, she apparently never received one.

## B.

In February 1999, Leverette brought suit in the District of South Carolina against Bell, in her individual capacity, for violating Leverette's constitutional rights under the Fourth Amendment, and against SCDC, for negligence.[1] Following extensive discovery, the defendants filed a motion for summary judgment on all of Leverette's claims. Leverette assented to the voluntary dismissal, without prejudice, of her negligence claim, leaving only her § 1983 claim against Bell. Bell moved for summary judgment solely on the basis of qualified immunity. After hearing argument on the immunity issue, the district court denied Bell's motion for summary judgment, and Bell timely filed this interlocutory appeal. We possess jurisdiction over this appeal pursuant to the collateral order doctrine. *See Winfield v. Bass*, 106 F.3d 525, 528-29 (4th Cir. 1997) (en banc) ("To the extent that an order of a district court rejecting a governmental official's qualified immunity defense turns on a question of law, it is a final decision within the meaning of § 1291 under the collateral order doctrine[.]") (citing *Mitchell v. Forsyth*, 472 U.S. 511, 524-30 (1985) (other citations omitted)).

## II.

We review de novo a district court's denial of summary judgment. *Hodge v. Jones*, 31 F.3d 157, 163 (4th Cir. 1994). Where, as here, the district court did not fully set forth the facts supporting its legal conclusion denying qualified immunity, we must review the materials submitted to the district court to determine what the record disclosed, viewing the facts in the light most favorable to the non-moving party. *See Winfield*, 106 F.3d at 533.

Before evaluating the merits of Bell's qualified immunity defense, we must establish her official status, i.e., whether she conducted the

---

[1]The negligence claim focused primarily on SCDC's failure to observe its own procedural protections regarding employee strip searches. *See infra* Part III.

challenged search while acting within the scope of her authority as Associate Warden of WRCI. *See In re Allen*, 106 F.3d 582 (4th Cir. 1997). Although Leverette insists that, under *Allen*, Bell's actions in conducting the search were outside of the scope of her authority, we find this argument unpersuasive.

*Allen* instructs that "an official may claim qualified immunity as long as his actions are not clearly established to be beyond the boundaries of his discretionary authority." *Id.* at 593. The relevant consideration under *Allen*, though, is not whether the official's actions were a proper, or even legal, exercise of her discretionary authority. *See id.* at 594 ("If these were the relevant inquiries, any illegal action would, by definition, fall outside the scope of an official's authority. To equate 'the question of whether the defendants acted lawfully with the question of whether they acted within the scope of their discretion' is 'untenable.'") (quoting *Sims v. Metro. Dade Co.*, 972 F.2d 1230, 1236 (11th Cir. 1992)) (internal citations omitted). Rather, we must ask whether a reasonable official in Bell's position should have known that the conduct was clearly established to be beyond the scope of her authority. *Id.*

As Leverette correctly observes, we have on occasion sought guidance from statutes and regulations in delineating the "outer perimeter" of an official's discretionary authority. *See* Appellee's Br., at 20-21 (citing *Allen*, 106 F.3d at 595).[2] While formal sources are instructive, a defendant does not lose official status for purposes of qualified immunity analysis simply by failing to adhere to an agency's stated policies. Leverette urges us to treat Bell's alleged reference to the "body cavity search" — as well as her testimony that having Leverette squat and cough was "still within policy" — as probative of her

---

[2]In *Allen*, we denied an immunity defense to the Attorney General of West Virginia, who had allegedly directed that an entity be incorporated in order to prevent an out-of-state organization from incorporating in West Virginia by the same name. Looking to West Virginia statutory provisions defining the responsibilities vested in the Attorney General, we concluded that the defendant could not reasonably have considered the incorporation of fictitious entities to fall within his carefully circumscribed authority. As such, he was acting not as the Attorney General, but as a private individual. *See* 106 F.3d at 598.

knowledge that the search transgressed SCDC Policy 1500.11. That policy provides for strip searches of SCDC employees only if justified by "specific objective facts" and conducted according to its procedural guidelines. *See* J.A. 615. It explicitly states, however, that employees "will not be subjected to body cavity searches." J.A. 611.

The parties disagree as to the proper classification of the search that occurred in this case. While it appears to have been more invasive than a standard strip search — requiring the subject to disrobe, squat, and cough — it also does not qualify as a true body cavity search.[3] Thus, it is not clear that Bell engaged in conduct specifically precluded by SCDC policy. Moreover, to the extent that the search did not conform to SCDC procedures — for example, the inmate's tip was not "reduced to writing prior to or immediately subsequent to the approving authority's decision" — we are not inclined to regard such nonconformance as sufficient to take Bell's conduct beyond the "outer perimeter" of her discretionary authority. In the context of an *Allen* analysis, an official's responsibilities are to be defined expansively. *See, e.g.*, *Harbert Int'l v. James*, 157 F.3d 1271, 1282-83 (11th Cir. 1998) (noting that the inquiry must be "properly defined," looking at the general class of conduct, e.g., transporting and delivering prisoners, rather than the specific unlawful conduct alleged, e.g., improperly transferring prisoners or placing them in inadequate facilities). To regard noncompliance with internal policies as necessarily removing an official from the realm of immunity would, in effect, erode that crucial defense. *See Allen*, 106 F.3d at 594. There is no

---

[3]Courts examining the constitutionality of physically intrusive searches have distinguished between strip searches, visual body cavity searches, and manual body cavity searches. A "visual body cavity search" requires the searched individual to expose her anal and vaginal cavities for visual inspection, whereas a "manual body cavity search" typically involves digital touching or probing by another person. *See, e.g.*, *Blackburn v. Snow*, 771 F.2d 556, 561 n.3 (1st Cir. 1985). The SCDC policy proscribing employee body cavity searches does not, however, specify the scope of such prohibition. Elsewhere, the SCDC policy governing inmate searches contemplates manual searches. Even if, as Leverette emphasizes, the policy governing inmate searches is inadmissible, it does suggest that there was at least a factual question as to whether the prohibition contained in Policy 1500.11 extended to visual body cavity searches.

question that assistant wardens of correctional facilities routinely supervise searches — including strip searches and even, under some circumstances, body cavity searches — and, thus, that Bell was acting within the scope of her authority for *Allen* purposes.

### III.

Under our *Allen* decision, Bell, as Associate Warden of WRCI, is clearly entitled to assert the defense of qualified immunity. Whether the defense is valid in Bell's case, however, requires us to conduct a two-step, sequential analysis. Initially, we must determine de novo whether the facts, viewed in the light most favorable to Leverette, establish the deprivation of an actual constitutional right. *See Hartley v. Parnell*, 193 F.3d 1263, 1268 (4th Cir. 1999) (citing *Wilson v. Layne*, 526 U.S. 603, 609 (1999)). If so, we proceed to consider whether that right was clearly established at the time of the purported violation. *Id.*[4]

Leverette maintains that the February 1998 search constituted a deprivation of her Fourth Amendment right against unreasonable searches and seizures, and that a reasonable officer in Bell's position would have known that her conduct violated a "clearly established" right. To support this position, Leverette relies primarily on SCDC's explicit policy against subjecting employees to body cavity searches. Bell denies that she conducted a "body cavity search" as prohibited by SCDC policy. In any case, she contends that the search was reasonable, and that, even if ultimately ruled unconstitutional, the law was not "clearly established" at the time of the search. We agree with Bell, and we conclude that the search, as conducted, was reasonable and consistent with Leverette's Fourth Amendment rights.

---

[4]The applicable authorities dictate that we analyze the constitutionality of the challenged search before addressing whether the law was "clearly established." Thus, we cannot bypass, and thereby evade, a constitutional determination wherever the law is uncharted or ambiguous. *See Milstead v. Kibler*, No. 00-1539, 2001 WL 256045, *3 (4th Cir. March 15, 2001) ("Were courts to rule on qualified immunity without determining the constitutionality of the challenged conduct, 'standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals.'") (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 844 n.5 (1998)).

In analyzing the reasonableness of a physically intrusive search, we must balance the government's need for the particular search against the invasion of personal rights entailed by the search. *See Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). More specifically, we must evaluate "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559.

Although the parties quarrel as to the proper definition of the contested search — Bell resisting Leverette's contention that it constituted a "body cavity search," as specifically prohibited by SCDC policy — the reasonableness of the search cannot rest on semantics. Leverette has essentially conceded that a routine strip search would have been proper. *See* Appellee's Br., at 18 ("Had Bell simply asked Leverette to remove her clothing, squat and cough[,] this lawsuit may never have happened."). Instead, Leverette was allegedly told that a body cavity search was to be conducted and was encouraged to expose her anal and vaginal cavities for visual inspection. Whether this search constituted a "body cavity search," specifically prohibited by SCDC Policy, it appears in any event to have deviated from SCDC's strip search procedures. *See* SCDC Policy 2100.3-23, J.A. 615. That discrepancy does not, however, necessarily render the search constitutionally unreasonable.

While this court has not addressed the standard applicable to the authorization of visual body cavity searches on prison employees, our decision is informed by the Supreme Court's decision in *Bell v. Wolfish*, along with relevant decisions of our sister circuits. In *Bell v. Wolfish*, the Court upheld a prison's practice of conducting visual body cavity searches on inmates following every contact visit — that is, absent individualized suspicion. 441 U.S. at 560. Emphasizing the "unique" security concerns present in the prison context, the Court concluded that, "[b]alancing the significant and legitimate security interests of the institution against the privacy interests of the inmates," visual body cavity inspections may be conducted on inmates on less than probable cause. *Id.*

The Court's decision in *Bell v. Wolfish* made clear that the "unique security dangers" present in correctional facilities may justify even the most intrusive searches, and its conclusion also reflects, inter alia,

the severely abridged privacy interests of prisoners. Thus, it leaves unresolved the circumstances and standards under which prison visitors and employees may be subjected to strip and body cavity searches. Several of our sister circuits, however, have examined issues concerning the privacy rights of prison visitors and employees, concluding that prison authorities must have at least a reasonable suspicion that the individual is bearing contraband before conducting an invasive search. *See, e.g.*, *Spear v. Sowders*, 71 F.3d 626, 630 (6th Cir. 1995) (regarding as "clearly established" the requirement that officials have reasonable suspicion before conducting strip or body cavity search of visitors, although authorities "need not secure a warrant or have probable cause"); *Blackburn v. Snow*, 771 F.2d 556, 562 (1st Cir. 1985) ("[A] rule requiring all prison visitors to submit to a body cavity strip search, without any predicate requirement of individualized suspicion or showing of special and highly unusual institutional need, cannot satisfy the Fourth Amendment."); *Thorne v. Jones*, 765 F.2d 1270, 1276 (5th Cir. 1985) (applying reasonable suspicion standard to strip searches of prison visitors); *cf. Sec. & Law Enforcement Employees v. Carey*, 737 F.2d 187, 204, 208 (2d Cir. 1984) (adopting reasonable suspicion standard for strip searches of correctional officers, but holding that a search warrant must be obtained before conducting a visual body cavity search).

We recognize that a prison employee such as Leverette does not forfeit all privacy rights when she accepts employment. Her expectations of privacy are, however, diminished in light of the prison's manifest interest in preventing the introduction of drugs, weapons, and other contraband. *See Sec. & Law Enforcement Employees*, 737 F.2d at 204. We consequently must reject Leverette's contention that this search was constitutionally impermissible. Instead, we conclude that prison authorities generally may conduct a visual body cavity search when they possess a reasonable and individualized suspicion that an employee is hiding contraband on his or her person. Our position on this point is bolstered by our sister circuits' decisions applying the reasonable suspicion standard to searches of prison visitors. *See, e.g.*, *Spear*, 71 F.3d at 630; *see also Sec. & Law Enforcement Employees*, 737 F.2d at 204 (cataloguing the "significant parallels between visitors to correctional facilities and correction officers who work in them").

We emphasize that reasonable suspicion is the minimum requirement, and point out that the more personal and invasive the search activities of the authorities become, the more particularized and individualized the articulated supporting information must be. In this instance, we are satisfied that the supporting information was more than adequate. The information was particularized and individualized, i.e., that Leverette was bringing contraband into the prison in a tampon on a specific occasion. *See, e.g.*, *Hunter v. Auger*, 672 F.2d 668, 675 (8th Cir. 1982) (requiring, under reasonable suspicion standard, "individualized suspicion, specifically directed to the person targeted for the strip search" and "reasonable cause to believe that drugs or other contraband are concealed in the particular place they decide to search"). It also bore indicia of reliability, i.e., the inmate-informant had provided accurate drug-related tips in the past. *See, e.g.*, *Spear*, 71 F.3d at 631 (reasonable suspicion satisfied where inmate-informant "had provided accurate and important information on at least one prior occasion").[5] Additionally, the decisionmaking process in this matter was entirely orderly and reasonable; Bell evaluated the information and consulted with her supervisor, Warden Carmichael, as to the proper handling of this difficult matter. Finally, the search itself, although exceedingly personal in nature, was administered in a sensitive and professional manner. The officials involved were all female, the search activity was conducted in a private setting, and it was handled with dispatch. *See generally Bell*, 441 U.S. at 559 (requiring courts to evaluate the manner in which a strip search or body cavity search is conducted); *also Amaechi v. West*, 237 F.3d 356, 364 (4th Cir. 2001) ("[W]e have repeatedly emphasized the necessity of conducting a strip search in private."); *Justice v. City of*

---

[5]As courts have observed elsewhere, an informant's status as a convicted felon does not necessarily impugn his reliability. *See Spear*, 71 F.3d at 631 n.3 ("[Plaintiff] makes much of the fact that the confidential informant was a convicted felon. However, a criminal conviction is a prerequisite for the role of prison informant."). Nor does the fact that no drugs were ultimately detected indicate the absence of reasonable suspicion; the reliability of a tip must not be evaluated in hindsight, but must be viewed at the time the search becomes necessary. *See, e.g.*, *Lindsey v. Storey*, 936 F.2d 554, 559 (11th Cir. 1991) ("[M]ore is required than a mere hindsight determination of whether reasonable suspicion existed at the time of the seizure[.]").

*Peachtree City*, 961 F.2d 188, 193 (11th Cir. 1992) (regarding the sex of the officers conducting a strip search as a relevant factor in evaluating its intrusiveness).

Leverette also emphasizes that Bell failed to comply with SCDC's internal policies regarding employee searches. Beyond the challenged physical intrusiveness of the search, Leverette objects that Bell waited nineteen days to reduce to writing the specific facts justifying the search, rather than recording them at the time the search was authorized. Leverette further notes that her signed consent was not obtained "until after the search was conducted, in clear contravention of SCDC Policy 1500.11." Appellee's Br., at 22. Once obtained, the consent form was improperly filed, in violation of SCDC's "standard operating procedure." *Id.*[6]

We find these contentions unavailing. That the search deviated from SCDC's formal policies and procedures does not render it unreasonable under the Fourth Amendment. Even if SCDC's policy against conducting body cavity searches on employees was violated here, such a violation does not in itself rise to constitutional dimensions.

IV.

Given our conclusion that no constitutional violation occurred, we need not reach the second step of the *Wilson v. Layne* qualified immunity analysis — that is, examining whether the law was "clearly established" at the time of the challenged conduct. *See supra* note 4. Bell was involved in a constitutionally permissible activity while acting in the scope of her authority as Associate Warden of WRCI, and she is therefore entitled to qualified immunity. Accordingly, we reverse the district court's order denying qualified immunity and remand for entry of judgment in Bell's favor.

*REVERSED AND REMANDED*

---

[6]The validity and effect, if any, of Leverette's written consent has not been raised on appeal by either party and is not before us. Its existence — and the manner and timing of its execution — is simply part of the factual scenario underlying this case.