# Wimms v. City of Philadelphia Civil Service Commission

*Anthony Wimms,* pro se appellant
*Brian J. Pierce* and *Zakia E. Moore,* for appellee

CEISLER, *J.*, May 30, 2012—

## I. FACTS AND PROCEDURAL HISTORY

The instant appeal has its origin in the firing of Anthony Wimms (hereinafter "appellant") by his employer, the Philadelphia Prison System (hereinafter "PPS"). Appellant was hired by PPS in late 2007 and was employed as a correctional officer, first at an alternative and special detention facility, then at the Philadelphia Industrial Correctional Facility (hereinafter "PICC"). Certified Record, pt. 3 at 1.[1]

---

1. As put before this court, the certified record is split into four

On January 12, 2011, appellant assisted in a "shakedown"[2] of a cell in the G-1 Unit at PICC. *Id.*, pt. 1 at 4. During the course of the shakedown, Sergeant Maria Diaz (who was helping to supervise the undertaking) noticed that appellant appeared to be wearing jeans underneath his officer's uniform, and notified her superior, Lieutenant Edwin Cruz. *Id.*, pt. 2 at 11-12. Separately, Sergeant Cruz Molina (who was also taking part in supervising the shakedown) noticed that appellant had not properly searched his assigned cell and was engaging in suspicious conversation with some of the prison inmates; Sergeant Molina also told Lieutenant Cruz of his concerns. *Id.* at 39, 42.

In response to these reports, Lieutenant Cruz ordered that each of the officers involved in the shakedown be subjected to pat searches. Pertinent prison supervisors and a union representative, Officer LaKeisha Sherman, were notified of Lt. Cruz's decision to take this action. Certified record, pt. 2 at 12, 56. Sergeant Diaz conducted the pat searches of each of the officers, with Officer Sherman serving as a witness to the proceedings. *Id.* at 12-14, 140.[3] During

---

separate PDF files. All citations to said record within this opinion point to a specific part of the record (e.g. the second PDF of the certified record is referred to as "pt.2"), followed by a page number (which refers to the location of the page within a given PDF, independent of any preexisting numbering on the page itself).

2. I.e. a search for contraband hidden by an inmate within the confines of his or her cell.

3. There is a minor discrepancy between the recollections of Sergeant Diaz and that of Officer Sherman, in that the former says she gave appellant a pat search and had to specifically tell him to empty his jeans pockets (where the whack was hidden), while the latter says that Diaz merely told appellant to empty his pockets, without conducting a physical search, and that the whack came out of appellant's uniform

the course of her pat search of appellant, Sergeant Diaz confirmed that appellant was wearing jeans underneath his uniform, whereupon she instructed appellant to empty his uniform pant pockets. *Id.* at 13, 141. Sergeant Diaz subsequently instructed appellant to produce the contents of his jeans pockets, which resulted in the discovery of a "whack," or homemade knife, possession of which was unauthorized and in violation of rules and regulations. *Id.* at 14, 140.3 Sergeant Diaz alerted Lieutenant Cruz to appellant's unauthorized weapon and attire. Lt. Cruz confiscated the knife and took photographs of appellant. Certified record, pt. 2 at 16, 62.

On March 29, 2011, after a PPS board hearing regarding the matter, appellant's employment was terminated for violating a number of PPS general orders and policies governing employee conduct. The effective date of firing was April 17, 2011. *Id.*, pt. 3 at 1-3, 17-23. appellant appealed this determination, and an administrative appeal hearing before the City of Philadelphia's Civil Service Commission (hereinafter "appellee").

On January 17, 2012, appellee convened the appeal hearing. Appellant attempted to rebut the allegations against him, arguing that it was not improper to be wearing jeans underneath his uniform, as jeans could not be deemed contraband, and that the discovery of the unauthorized homemade knife was the result of an illegal

---

pockets; however, the facts contained in this section of the opinion are that which were agreed upon by the Civil Service Commission. *See* Certified Record, pt.1.

strip search. *Id.*, pt.2 at 8, 78-83, 169. Appellee found that he had violated PPS policy by wearing contraband (i.e. the jeans), not informing his supervisor about possession of the knife, and, more generally, "[not] maintaining the safety and good order of the institution by falsely lying and trying to conceal contraband while inside the institution to staff and supervisor." Certified record, pt. 1 at 5-6. Accordingly, appellee unanimously upheld appellant's dismissal in an opinion dated May 2, 2013.

On June 1, 2012, appellant appealed the determination by the Civil Service Commission to the court of common pleas. Appellant filed a brief to support said appeal on January 7, 2013, raising both the illegal search and contraband issues, and, for the first time, arguing that racial discrimination factored into his firing. Appellant's brief, at 1. Additionally, appellant argued that appellee's decision to uphold his termination was based, in part, upon hearsay evidence regarding how he relinquished the whack to his supervisors at PICC. *Id.*

On February 6, 2013, appellee filed a response brief, stating that appellant's dismissal was proper, that the search was not illegal, and that appellant had waived any ability to raise the racial discrimination issue by failing to first do so at the January 17, 2012 hearing. Appellee's brief, at 4-5.

On March 14, 2013, this court heard oral argument regarding appellant's appeal. At the close of said hearing, this court denied appellant's appeal by order docketed on March 15, 2013. On April 16, 2013, appellant appealed

this court's denial to the Superior Court of Pennsylvania.

## II. STANDARD OF REVIEW

This court's review of appellee's decision is governed by the dictates of the Local Agency Law, which reads in pertinent part, "In the event a full and complete record of the proceedings before the local agency was made, the court shall hear the appeal without a jury on the record certified by the agency." 2 Pa. C.S. §754(b). "A 'full and complete record' is defined as 'a complete and accurate record of the testimony taken so that the appellant is given a base upon which he may appeal and, also, that the appellate court is given a sufficient record upon which to rule on the questions presented.'" *In re Thompson*, 896 A.2d 659, 668 (Pa. Commw. Ct. 2006) (quoting *City of Philadelphia v. Bd. of License and Inspection Review*, 590 A.2d 79, 86 (Pa. Commw. Ct. 1991)). Where such a record exists, "appellate review of an adjudication of a municipal civil service commission is limited to determining whether constitutional rights have been violated, an error of law has been committed or findings of fact necessary to support the adjudication are not supported by substantial evidence." *Lewis v. Civil Serv. Comm'n*, 542 A.2d 519, 522 (Pa. 1988); *see* 2 Pa. C.S. §754(b) (articulating appellate review standard for local agency decisions where a complete record has been provided); *see also Banks v. Civil Serv. Comm'n*, 708 A.2d 890, 891 n. 1 (Pa. Commw. Ct. 1998) (citing *Republic Steel Corp. v. Workmen's Comp. Appeal Bd.*, 421 A.2d 1060 (Pa. 1980)) ("[I]n order to reverse the decision of an administrative agency, [an appellate court]

must conclude that the findings of the agency are totally without support in the record."); This Court determined that the certified record, as provided to it by Appellee, was full and complete, and thus that the appropriate standard of review for the matter before it was of the limited nature articulated in 2 Pa. C.S. §754(b). See Certified record, pts. 1-4.

## III. DISCUSSION

Appellant raised the four following issues in his appeal of the determination of the Civil Service Commission to the common pleas court: 1. That appellee improperly admitted hearsay evidence at the hearing; 2. That racial discrimination factored into his firing; 3. That the wearing of jeans was not barred by PPS policy and that, as such, jeans could not be considered contraband; and 4. That the aforementioned search was illegal. Appellant's brief, at 1.

This court respectfully requests that the instant appeal be denied for the following reasons:

1. The testimony given at the administrative appeal hearing was properly admitted and, additionally, was not hearsay;

2. Appellant waived his ability to argue that that racial discrimination played a role in his termination, as he failed to raise that issue at the administrative appeal level;

3. Sufficient evidence exists to support appellee's determination that appellant was wearing contraband,

in the form of jeans; and

4. The unauthorized weapon was discovered as the result of a constitutionally valid search.

1. No inadmissible hearsay evidence was offered against the appellant

Appellant asserts that he "was wrongfully discharged from my employment based on baseless speculation and hearsay and inaccurate information." Appellant's brief, at 1. Appellant clarified this vague argument at the March 14, 2013 appeal hearing, stating that "hearsay" referred to information about how he relinquished the unauthorized homemade knife. 3/14/13 N.T., 5:13-23. Presumably, appellant was talking about the testimony given by Officer Sherman and Sergeant Diaz at the January 17, 2012 administrative appeal hearing. *See* Certified record, pt. 2 at 13-14, 140-141.

Officer Sherman and Sergeant Diaz testified, under oath, at the administrative appeal hearing regarding how the unauthorized knife was recovered from the appellant. They were both subject to direct and cross examinations. Their testimony about how the knife was recovered was not, in fact, hearsay, and would be admissible in any court of this Commonwealth. *See* Pa. R.E. 801(c) ("'Hearsay' means a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.").

Even assuming, *arguendo*, that the testimony of

Officer Sherman and Sergeant Diaz was hearsay, the rules governing local agency hearings specifically state that the "technical rules of evidence [do not apply], and all relevant evidence of reasonably probative value may be received." 2 Pa. C.S. §554. Thus, statements, documentation, and other forms of information that would otherwise be deemed inadmissible hearsay at other court proceedings are deemed admissible at such hearings.

2. Appellant waived his right to argue that his termination was the result of racial discrimination

Appellant alleged that his termination was racially-motivated, in that he was subjected to discrimination by his Hispanic supervisors and coworkers on account of appellant being African-American. *See* Appellant's brief, at 1. This argument was not raised by Appellant before or during his administrative appeal hearing; instead, appellant waited until after he had appealed to the court of common pleas to make such a claim.

> "Issue preservation is foundational to proper appellate review. Our rules of appellate procedure mandate that '[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal.' Pa. R.A.P. 302(a). By requiring that an issue be considered waived if raised for the first time on appeal, our courts ensure that the trial court that initially hears a dispute has had an opportunity to consider the issue."

*In the Interest of F.C. III*, 2 A.3d 1201, 1211-12 (Pa. 2010)

(citation omitted).

This reasoning also applies to administrative adjudicative proceedings. As articulated by the Pennsylvania Supreme Court:

> "[An] administrative law tribunal must be given the opportunity to correct its errors as early as possible; diligent preparation and effective advocacy before the tribunal must be encouraged by requiring the parties to develop complete records and advance all legal theories; and the finality of the lower tribunals' determinations must not be eroded by treating each determination as part of a sequence of piecemeal adjudications."

*Wing v. Com., Unemployment Comp. Bd. of Review*, 436 A.2d 179, 181 (Pa. 1981).

At no point in time was appellee called upon to decide whether appellant's firing was motivated, in whole or part, by racial discrimination. It is also telling that appellant fails to offer a scintilla of evidence regarding racial discrimination, but only makes a bald assertion that his Hispanic supervisors and coworkers were racists. Accordingly, this court properly determined that appellant waived his right to raise this issue at his appeal to the court of common pleas.

3. The jeans that appellant was wearing underneath his uniform were properly determined to be contraband

Appellant argues that PPS policy does not bar

correctional officers from wearing jeans underneath their uniforms and, thus, that appellee erred in deciding that jeans constituted contraband. However, the record clearly indicates that the appellant violated uniform rules and regulations by concealing jeans under his mandated uniform. As noted above, absent a lack of substantial evidence that supports a given finding, a court is prohibited from invalidating a factual determination made at an administrative hearing. It is readily apparent that PPS regulations tightly circumscribe the uniform and grooming options for on-duty correctional officers and that jeans are not present on the list of approved articles of clothing. *See* Certified Record, pt. 4 at 31-32. Additionally, while PPS does not explicitly deem jeans to be "contraband," PPS policy does generally define contraband as "any item or substance that is not allowed in the facility because it may be used to compromise the safety and security of the facility or its staff and inmates." *Id.* at 3, 20. When these points are coupled with the testimony given by Sergeant Diaz[4] and Lieutenant Cruz,[5] both of whom stated that

---

4. See *Id.* at 16 ("*Haviland*: Are you aware of other officers that wear jeans underneath their clothing while working at PPS? *Diaz*: No. *Haviland*: Is there a reason why other officers wouldn't be wearing jeans underneath their uniforms while working at PPS? *Diaz*: No, because it's like contraband. Because you're wearing civilian clothes underneath and you're taking into the facility, we don't know what your intentions are. *Haviland*: What would be the fear? *Diaz*: An inmate can escape. *Haviland*: And how would they use a pair of jeans to do that? *Diaz*: The officer could come inside, remove it, lay it down, an inmate come, pick it up, and walk right out the front door.").

5. See *Id.* at 57 ("*Haviland*: Is a weapon considered contraband? *Cruz*: Yes, it is. Haviland: What about blue jeans worn under a uniform? *Cruz*: That's considered contraband. *Haviland*: And why are blue jeans underneath a uniform considered contraband? *Cruz*: Security breech [sic] of the institution. *Haviland*: And why - what is it about blue jeans that is a breach? *Cruz*: Those jeans can be taken off and be given to an

correctional officers were barred from wearing jeans and whom appellee found to be credible, it is apparent that substantial evidence exists to support appellee's finding that appellant's jeans were prohibited contraband; as such this court declined to invalidate appellee's factual determination.

### 4. The search of appellant was constitutional

Appellant incorrectly asserts that the discovery of the unauthorized knife was the result of an illegal search, specifically, that the factual circumstances preceding the search did not provide grounds for reasonable suspicion that appellant might be carrying contraband. This is an issue of first impression, as Pennsylvania courts have yet to articulate the level of suspicion, necessitated by Pa. Const. art. I, §8, that justifies a pat search of a correctional officer,[6] when said search occurs inside of a prison.[7]

Protection from unlawful search and seizure is rooted in the Fourth Amendment of the United States Constitution, which declares: "The right of the people

---

inmate, and the inmate can put them on, get a sweatshirt or something like that, and walk right out of the institution.").

6. The text of this constitutional provision is as follows: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant."

7. Appellant alleges that he was subjected to a strip search, not a pat search; however, appellee determined that only a pat search occurred, and there is substantial evidence to support this finding. *See* Certified record, pt. 1 at 4-5; *Id.*, pt. 2 at 12-14, 83, 109, 140-41; *see also Com. v. Martinez*, 2013 Pa. Super. 102 (Pa. Super. Ct. May 2, 2013) (quoting *Allison v. GEO Group, Inc.*, 611 F. Supp. 2d 433, 453 n.12 (E.D. Pa. 2009)) (discussing what constitutes a "strip search").

to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining the scope of the Fourth Amendment, courts have availed themselves of Justice Harlan's two-part test, which he articulated in his concurring opinion for *Katz v. United States,* 389 U.S. 347 (1967). First, it must be demonstrated that an individual had an "actual (subjective) expectation of privacy." *Id.* at 361. Second, it must be shown that the expectation is deemed reasonable by society. *Id.*

Federal courts have repeatedly highlighted the unique and dangerous environment inherent to correctional facilities. The United States Supreme Court (hereinafter "Supreme Court") has noted generally that "without attempting either to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room." *Lanza v. State of N.Y.,* 370 U.S. 139, 143 (1962). Elaborating on this point, the Supreme Court has stated that:

> "Within this volatile 'community,' prison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but also visitors. They are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves. They must be ever alert to

attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today."

*Hudson v. Palmer,* 468 U.S. 517, 526-527 (1984).

In light of this reality, federal courts have determined that correctional officers have limited privacy rights when operating within the confines of a prison. The Second Circuit has opined that "society[] is prepared to recognize as reasonable the proposition that correction officers have diminished expectations of privacy in light of the difficult burdens of maintaining safety, order and security that our society imposes on those who staff our prisons," a proposition that has been echoed in rulings from numerous, other courts. *Sec. and Law Enforcement Employees, Dist. Council 82 v. Carey,* 737 F.2d 187, 202 (2d Cir. 1984); see *Allegheny Cnty. Prison Employees Indep. Union v. Cnty. of Allegheny,* 124 Fed.Appx. 140, 141 (3rd Cir. 2005); *Leverette v. Bell,* 247 F. 3d 160, 167-68 (4th Cir. 2001); *McDonell v. Hunter,* 809 F.2d 1302, 1306-7 (8th Cir. 1987); *Pierce v. Ohio Dep't of Rehab. & Corr.,* 284 F. Supp. 2d 811, 833 (N.D. Ohio 2003) ("any expectation of privacy [correctional officers] have is unquestionably diminished given the setting of their employment."); *see also Gettleman v. Werner,* 377 F. Supp. 445, 447 (W.D. Pa. 1974) ("[c]onstitutional Rights of an employee in a penitentiary may be diluted by the specialized requirements of discipline, safety and security.").

Accordingly, there is general consensus that mere reasonable suspicion, and not probable cause, is necessary

for a search of an on-duty correctional officer to pass constitutional muster. *See Leverette*, 247 F.3d at 167-68 (finding that reasonable suspicion standard applied to strip-search of prison employees); *McDonell*, 809 F.2d at 1306 (same); *Carey*, 737 F.2d at 204(same); *Pierce*, 284 F.Supp. 2d at 834 (same). Federal courts have also noted that the required level of suspicion is directly linked to the nature of the search. *See Leverette*, 247 F.3d at 168 ("We emphasize that reasonable suspicion is the minimum requirement, and point out that the more personal and invasive the search activities of the authorities become, the more particularized and individualized the articulated supporting information must be."). Though the bulk of the relevant federal case law deals with strip searches, federal courts (in line with the *Leverette* sliding-scale concept) have recognized that less suspicion will be necessary to justify minimally invasive searches, such as pat-downs and pocket searches. *See Morris v. Valeriano*, 2007 WL 1851167 (D. Conn. 2007) (recognizing that a reasonable suspicion standard applies in the case of intrusive strip-searches and suggesting that the standard be applied even more leniently to less intrusive searches, such as pat-downs); *see also Adrow v. Johnson*, 623 F.Supp. 1085 (N.D. Ill. 1985) (applying reasonable suspicion to searches that fell slightly short of strip-searches).

Though reasonable suspicion is the standard on the federal level, it is important to recognize that "[u]nder certain circumstances, 'our state constitution provides greater protection than the Fourth Amendment.'" *Com. v. Moore*, 928 A.2d 1092, 1099-100 (Pa. Super. Ct.

2007) (quoting *Com. v. Hoak*, 700 A.2d 1263, 1266 (Pa. Super.1997) (en banc), *aff'd*, 734 A.2d 1275(Pa. 1999)); *Jones v. City of Philadelphia*, 890 A.2d 1188, 1196 (Pa. Commw. Ct. 2006) (citing *Com. v. Smith*, 836 A.2d 5, 15 (Pa. 2003)). In determining whether a portion of the Pennsylvania Constitution provides protections above and beyond that afforded by the United States Constitution, a court must look at the "(1) text of the Pennsylvania constitutional provision; (2) history of the provision, including Pennsylvania case-law; (3) related case-law from other states; [and] (4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence." *Com. v. Edmunds*, 586 A.2d 887, 895 (Pa. 1991). However, it is imperative that a court "construe the Pennsylvania constitution as providing greater rights to its citizens than the federal constitution 'only where there is a compelling reason to do so.'" *Jones*, 890 A.2d at 1199 (quoting *Com. v. Gray*, 503 A.2d 921, 926 (Pa. 1985)); *Com. v. Crouse*, 729 A.2d 588, 596 (Pa. Super. Ct. 1999). Additionally, in the context of search and seizure, the scope of an individual's Pa. Const. Art. I, §8 rights still must be ascertained via use of the aforementioned two-part test from *Katz*, 389 U.S. at 361. *Com. v. Duncan*, 817 A.2d 455, 463 (Pa. 2003); *see also Twp. of Lower Milford v. Britt*, 695 A.2d 958, 960 (Pa. Commw. Ct. 1997) ("A search under the Fourth Amendment occurs where there is a government intrusion upon an individual's legitimate expectation of privacy, an expectation which must be actual and one that society recognizes as being reasonable."); *Com. v. Rood*,

686 A.2d 442, 446 (Pa. Commw. Ct. 1996); *Com. v. Viall,* 890 A.2d 419, 422 (Pa. Super. Ct. 2005) (citing *Com. v. Peterson,* 636 A.2d 615, 619 (Pa. 1993)) ("In determining whether a person's expectation of privacy is legitimate or reasonable, the totality of the circumstances must be considered and the determination will ultimately rest upon a balancing of the societal interests involved.").

As noted above, one of the primary concerns regarding a correctional facility is the maintenance of security within its walls. *Hudson,* 468 U.S. at 526-527; *see also Small v. Horn,* 722 A.2d 664, 670 (Pa. 1998) (correctional facility administrators "must enforce reasonable rules of internal prison management to ensure public safety and prison security."); *Moore,* 928 A.2d at 1102 (quoting *Payne v. Commonwealth Dept. of Corr.,* 871 A.2d 795, 809 (Pa. 2005)) ("[B]ecause of the unique nature and requirements of the prison setting, imprisonment 'carries with it the circumscription or loss of many significant rights ... to accommodate a myriad of institutional needs ... chief among which is internal security.'"). This is reflected in a number of statutory provisions regarding correctional officers, which detail the types of training that must be given, the promulgation of duty and behavioral standards, and the broad powers afforded to those charged with guarding prisoners. *See* 61 Pa. C.S. §1734; 37 Pa. Code §§95.221, 95.224; *cf.* Certified Record, pt. 4 (PPS personnel and security-related policies). By virtue of the weighty responsibilities inherent to the position, and the environment in which they operate, correctional officers must be held to a stringent standard, one which

ensures high levels of professionalism and integrity. Such a standard necessitates the thorough investigation of legitimate suspicions and concerns about individual officers, so that any impropriety does not affect overall institutional control and safety. To that end, a correctional officer has, in an objective sense, a diminished privacy interest when operating inside of a prison or other, similar facility. *Cf.* Katz, 389 U.S. at 361 (an expectation of privacy must be deemed reasonable by society for Fourth Amendment-based protections to attach); *Duncan*, 817 A.2d at 463 (*Katz* test is used to determine scope of Pa. Const. Art. I, §8 rights). This determination is consistent with the handful of relevant cases from other states. *See Boyd v. Civil Serv. Comm'n*, 559 N.W.2d 342, 347 (Mich. App. 1996) (strip search of prison guard justified when based upon reasonable suspicion); *Clark v. State,* 395 So.2d 525 (Fla. 1981) ("[a] prison guard's expectation of privacy is extremely limited by the environment that he or she chooses to work in."); *State v. Paruszewski*, 466 P.2d 787, 789 (Ariz. App. 1970) (non-consensual searches of prison employees are reasonable and constitutional, due to prison-related security concerns). Accordingly, this court concluded that correctional officers are not provided greater search-related protection by Pa. Const. Art. I, §8 than those afforded to them by the Fourth Amendment. Thus, reasonable suspicion is all that is required for a search of such individuals to comport with the dictates of both the United States Constitution and the Pennsylvania Constitution.

In the instant matter, appellant's actions during the

shakedown created reasonable suspicion sufficient enough to render the resulting pat search permissible under both the United States Constitution and the Pennsylvania Constitution. It is well-settled that reasonable suspicion must be based upon "specific and articulable facts and reasonable inferences drawn from those facts," rather than mere conjecture or baseless speculation. *Com. v. Jackson,* 698 A.2d 571, 573 (Pa. 1997) (citing *Terry v. Ohio,* 392 U.S. 1, 27 (1968)). While "certain facts, taken alone, do not establish reasonable suspicion ... a combination of these facts may [do so]." *Com. v. Cook,* 735 A.2d 673, 677 (Pa. 1999) (citations omitted). Here, the record reveals that three distinct facts existed that created reasonable suspicion that something was amiss. First, appellant's coworkers noticed that he appeared to be wearing jeans under his uniform, in violation of PPS anti-contraband policies. This alone vitiated any reasonable expectation of privacy he may have had to the contents of his pockets. Second, appellant failed to properly shakedown his assigned cell. Finally, appellant was seen conversing with several inmates during the course of this shakedown. Appellant's coworkers and supervisors were concerned by his behavior, and followed up on their concerns by having Sergeant Diaz conduct a minimally-invasive pat search.

This response was certainly justified by the circumstances, given that each of appellant's aforementioned actions called into question his integrity and threatened to negatively affect both public safety and institutional control at PICC. Consequently, the pat search comported with the requirements of both the United States

Constitution and the Pennsylvania Constitution. As such, this court determined that the whack was not discovered as the fruit of an illegal search.

## III. CONCLUSION

For the aforementioned reasons, this court respectfully requests that the instant appeal be denied.