590 A.2d 79

**CITY OF PHILADELPHIA**

v.

**BOARD OF LICENSE AND INSPECTION REVIEW to the Use of PARKWAY CORPORATION.**

**Appeal of PARKWAY GARAGE, INC.**

Commonwealth Court of Pennsylvania.

Argued April 4, 1991.

Decided April 18, 1991.

Petition for Allowance of Appeal Denied Oct. 28, 1991.

Samuel E. Klein, with him, Harold E. Kohn, Robert J. LaRocca and Joseph C. Kohn, Kohn, Savett, Klein & Graf, P.C., Philadelphia, for appellant.

Susan Shinkman, Divisional Deputy City Sol., Philadelphia, for appellee.

Before COLINS and KELLEY, JJ., and BARBIERI, Senior Judge.

COLINS, Judge.

Parkway Garage, Inc. (Parkway) appeals from an Opinion and Order of the Philadelphia County Court of Common Pleas (Common Pleas). The Order reads as follows:

AND NOW, this 15th day of February, 1991 it is hereby ORDERED and DECREED that the parking ga-

rage operated by Parkway Garage, Inc. at 15th Street between Arch Street and John F. Kennedy Boulevard is hereby closed as of 12:01 A.M., Saturday, February 16, 1991. This closure includes all vehicular and pedestrian traffic.

It is further ORDERED and DECREED that Parkway Garage, Inc. submit to this Court, a proposal and plan that will correct the imminently dangerous condition and render the premises safe for public use. This proposal and plan to be submitted by March 18, 1991.

The subject garage is owned by the City of Philadelphia (City), which leases the garage to the Philadelphia Parking Authority (Parking Authority), which in turn subleases the garage, through a series of assignments, to Parkway. The lease extends until December 31, 1999. The garage was constructed in the early 1960's and opened for use in 1965.

In 1987, the Parking Authority instituted action against Parkway in Common Pleas, alleging that Parkway had breached its repair obligations under its lease based on a theory that de-icing salts from the streets had caused the concrete and reinforced steel to deteriorate, weakening the garage and making it unsafe.[1] Common Pleas ordered the matter to binding arbitration before the American Arbitration Association, pursuant to binding arbitration provisions

---

**1.** Although this was the purported basis for the Parking Authority's complaint, there was testimony during the arbitration proceedings by the former Executive Director of the Parking Authority that in the early 1980's, he initiated an investigation of the lease to determine if there were any possible breaches or any other basis upon which it could be terminated because "the income that the City, the Parking Authority were deriving from that operation, was quite low." He testified further that after thorough scrutiny, he determined that "the lease was solid; had not been breached and there were no grounds for us to terminate it or to re-negotiate it." Notes of Testimony (N.T.), September 21, 1990, at 4084–4085. Further, in 1987, the City through its Controller's Office, assisted by the firm of Ernst & Whinney, and by obtaining the services of The First Boston Corporation and P.G. Corbin and Co., obtained economic analysis of, *inter alia,* the Parkway Garage operations. As a result, the City was advised, both in a letter from the Acting City Controller and in a report prepared by First Boston and P.G. Corbin, that it would be more economically advantageous for the City to regain operation of the garage and/or to sell it.

in the lease.  In March, 1989, two load tests were conducted in accordance with the appropriate testing procedures of the American Concrete Institute and The Philadelphia Code at sites selected by the Parking Authority's expert.  The test results, presented to the arbitration panel, revealed that the garage was well within the Code's requirements.  The arbitration panel heard 25 days of testimony between January, 1990 and December, 1990.  In addition, the panel, which included an engineer, twice toured the entire garage. The chief expert witness for the Parking Authority, Michael Brainerd, from the firm of Simpson, Gumpertz and Hegler in Boston, Massachusetts, testified in February, 1990, that he did "not think there is a risk of collapse at this time." He further testified that "[t]he only way to determine an unsafe area would be to load test it to see whether it was unsafe."  Parkway's chief expert witness was H. Carl Walker of Carl Walker Engineers, Inc., Kalamazoo, Michigan, who assisted Parkway in presenting a proposal for repairing the garage to keep it safe and operational.

The arbitration panel issued its decision on December 14, 1990, rejecting the Parking Authority's claim that the garage was unsafe and ruling that Parkway should continue to monitor the garage through a program of load testing at six month intervals, and perform state of the art patch and seal repairs where load test results indicated that such repair was necessary.

On December 4, 1990, the Philadelphia Department of Licenses and Inspections (Department) issued a notice pursuant to Title 4 (Building Code) of The Philadelphia Code [2] declaring the garage imminently dangerous and unsafe for occupancy and ordering the garage closed after 12:01 A.M., December 5, 1990, except for the purpose of making re-

**2.**   Title 4 was repealed in its entirety by Philadelphia Ordinance 1428, enacted in 1987.  Ordinance 1428 adopted and incorporated into The Philadelphia Code, as the Building Code of the City of Philadelphia, new Title 4, The BOCA National Building Code, Tenth Edition, 1987 (BOCA Code), as published by the Building Officials and Code Administrators International, Inc.

pairs.[3] Section 121.1, entitled "Vacating structures," of the BOCA Code, under Section 121.0, entitled "EMERGENCY MEASURES," provides:

When, in the opinion of the Code official, there is actual and immediate danger of failure or collapse of a building or structure or any part thereof which would endanger life, or when any structure or part of a structure has fallen and life is endangered by the occupation of the building or structure, the code official is hereby authorized and empowered to order and require the inmates and occupants to vacate the same forthwith. The code official shall cause to be posted at each entrance to such building a notice reading as follows: This Structure is Unsafe and its Use or Occupancy has been Prohibited by the Code Official. It shall be unlawful for any person to enter such building or structure except for the purpose of making the required repairs or of demolishing the same.

Parkway appealed the December 4, 1990 notice to the Philadelphia Board of License and Inspection Review (Review Board). The Review Board held four hearings on the matter on December 11, 1990, December 20, 1990, January 7, 1991 and January 8, 1991, each of which was stenographically recorded and transcribed. Both Parkway and the City presented expert testimony. Parkway submitted reports prepared by Ambric Engineering, Inc. of Philadelphia, Pa., detailing the results of load tests conducted at the garage on four separate occasions from December 17, 1990 to January 4, 1991. These load tests were conducted in accordance with the prescribed standards developed by the

---

3. A previous notice of violation of the Code was issued by the Department on or about October 5, 1990, following which Parkway met with the Department and agreed to provide the City with an engineer's professional opinion as to the structural conditions of the garage, to provide the City with periodic reports from an engineer following specific testing procedures, and to provide the City with a plan showing Parkway's intention for carrying out the safe repair of identified areas of deterioration. Further, Parkway agreed to notify the City as the repairs were completed. There is evidence of record that Parkway complied with all terms of the agreement, that the garage was approved for reopening, and reopened in stages between October 11, 1990 and November 14, 1990.

American Concrete Institute, as set forth in the BOCA Code to resolve the issue of structural stability "[w]henever there is reasonable doubt as to the stability or structural safety of a completed building or structure or part thereof for the intended use." [4] The tests were performed at four locations selected by the City's expert witness, Michael L. Brainerd. All of the tests were conducted by Ambric Engineering, Inc. and were supervised by Carl Walker Engineering. Representative members of those two firms, as well as Parkway Corporation and Simpson, Gumpertz & Hegler, were present during all tests.

The locations of tests I and II were those where the previous testing had been done in March of 1989. The locations in tests III and IV had not been tested previously. Test II was designed to apply a uniform load of 125 pounds per square foot (psf) over the test area. Tests I, III and IV were designed to apply a uniform load of 100 psf over the test areas. Numerous gauges, with dial indicators having a range of one inch and graduated in 0.001 inch increments, were set in place to measure "deflections" (downward bending), as pressure was applied, and to measure "recovery" (rebound to the original condition) following removal of the load.[5] The maximum allowable deflection permitted under the BOCA Code is .567. Test I area showed a maximum deflection of .205. Test II area showed a maximum deflection of .105 under the 125 psf load.[6] Test III area showed a maximum deflection of .171, and Test IV area showed a maximum deflection of .205. Clearly, all deflections were less than 50% of the permitted deflection under the BOCA Code, or stated differently, exceeded the minimum safety standards by 100%.

4. Section 1303.5 of the BOCA Code.

5. The pressure placed on the test areas was between 100 to 125 psf. If the garage were fully packed with cars, the pressure on the structure would be between 20 to 25 psf.

6. Additional testing was performed at the test II site. Eight cars were parked in the area to simulate as closely as possible the actual loading and behavior of the slab. During this actual loading test, maximum recorded deflection was 0.071.

The BOCA Code does not require recovery readings where, as here, the deflections were less than .567. Where recovery readings are necessary, the BOCA Code requires 75% recovery within twenty-four hours following removal of the load. Although recovery readings were obviously not required here, Ambric Engineering did report recovery readings for each of the four test areas. The test results evidenced recovery, within thirty minutes or less, of between 86.32% and 95.5%.

Mr. Brainerd testified on behalf of the City at the January 7, 1991 hearing. He stated that he has "a fundamental disagreement with the utility of load tests in this situation." [7] However, he testified further, on cross, that he was present during all four load tests and that he particularly selected one of the test areas, because it was the most severely delaminated area in the garage; [8] that the tests performed on the areas in tests I and II showed no significant change "detectable by a load test" from the results of previous tests done in those same areas in 1989; [9] and that following the load tests he had not observed any further cracking around the columns in the garage as a result of those tests. [10] He stated that he had previously testified during arbitration proceedings, February 16, 1990, that load testing was the appropriate method for demonstrating safety, [11] and when asked if it was his opinion from "eyeballing"

7. N.T., January 7, 1991, at 75. Mr. Brainerd disputes whether load testing can predict probability of "shear failure." He stated that "[s]hear failure involves the shearing of the slab [or vertical cracking and shifting] in the vicinity of the column, [that] can occur suddenly, without much warning." N.T., January 8, 1991, at 8.

8. N.T., January 8, 1991, at 44–45. Delamination refers to the deterioration of concrete because of exposure to and subsequent penetration of de-icing salts. During the winter months, the de-icing salt laden water dripping off the cars permeates the concrete, ultimately causing rust to build up on the steel reinforcement bars within the concrete. The rust expands, causing stress within the slab, which eventually results in fractures. These fractures, in turn, enable further deterioration.

9. N.T., January 8, 1991, at 46–48.

10. N.T., January 8, 1991, at 62.

11. N.T., January 8, 1991, at 55.

the exposed areas in and around the columns, it was imminently dangerous, he responded: "I'm not saying it's imminently dangerous." [12]

Parkway presented the expert testimony of Dr. Mete A. Sozen, a nationally prominent structural engineer, a Board member of the American Concrete Institute, and Chairman of the Subcommittee on Serviceability, Safety and Analysis for the American Concrete Institute. Dr. Sozen was present during the load testing and testified before the Board that all testing was performed in accordance with the standards required under the BOCA Code.[13] He stated that he saw no visible evidence of shear failure whatsoever.[14] Dr. Sozen stated that from his analysis of the original construction drawing, the garage was a "very well built garage ... [a]nd the reason it passed the load test is because it was designed with generous use of material so that whatever was eroded out of it over the years has not compromised the strength to a level that the code would not accept." [15] On conclusion of direct examination, the following testimony occurred:

Q. Okay. In your opinion, today mindful of public safety, can this garage be opened today?

A. In my opinion, this garage can be opened today.

N.T., January 8, 1991, at 16.

The Review Board issued its decision January 9, 1991, sustaining Parkway's appeal and providing that the garage could be reopened with the condition that areas where repairs were to be immediately made were to be cordoned off. The City appealed the decision of the Review Board to Common Pleas on January 9, 1991, but failed to serve notice of the appeal on the Review Board. The City also requested a supersedeas, which was denied following argument. The City requested a trial de novo, which was granted by

12. N.T., January 7, 1991, at 81.
13. N.T., January 8, 1991, at 7.
14. N.T., January 8, 1991, at 8–9.
15. N.T., January 8, 1991, at 12–13.

Common Pleas over Parkway's objections pursuant to Section 754(b) of the Local Agency Law, 2 Pa.C.S. § 754(b).

Common Pleas issued its decision and order February 15, 1991, reversing the Review Board and ordering that the garage be closed as of 12:01 A.M., February 16, 1991. The order further directed that Parkway submit to the court, by March 18, 1991, a proposal and plan to correct the "imminently dangerous condition and render the premises safe for public use." Parkway petitioned this Court for stay pending appeal, for summary reversal of Common Pleas' decision, and for expedited appeal of Common Pleas' decision.

By order of this Court dated February 21, 1991, the petition for summary reversal was denied. Argument was heard on the petition for stay pending appeal on February 25, 1991. The Court issued an Opinion and Order granting the stay on the basis that Parkway had satisfied the criteria necessary for a stay pending appeal set forth in *Pennsylvania Public Utility Commission v. Process Gas Consumers Group*, 502 Pa. 545, 467 A.2d 805 (1983). The petition for expedited appeal was granted and argument was heard before the Court on April 4, 1991. This Opinion and Order follows.

Our thorough review of the record indicates the following chronology of events. The Parking Authority first lost in the Court of Common Pleas because of the binding arbitration clause within a lease authored by the Parking Authority. Following extensive, non-appealable arbitration proceedings, Parkway again prevailed. Having been rebuffed in both these attempts to regain possession of the garage, the City, Parkway's assignor, then condemned the garage because of an alleged safety hazard. Exhaustive hearings before the Review Board, whose members were appointed by the Mayor pursuant to the Home Rule Charter, were held and the City again failed to prevail. Subsequent to this, an *ex parte* motion was filed before Common Pleas which, despite an apparent lack of *de novo* jurisdiction,

reversed the Review Board and substituted its own factual findings.

■ Parkway first argues that Common Pleas violated 2 Pa.C.S. § 754(b) and Philadelphia Civil Rule 320 by conducting a de novo trial, by failing to consider the full and complete administrative record made before the Review Board, and by substituting its judgment for that of the Review Board. Parkway asserts that Common Pleas erroneously disregarded Section 754(b) of the Local Agency Law by giving no consideration to the record below and by failing to adhere to the mandated scope of review. Moreover, Parkway maintains that Common Pleas erroneously assumed plenary equity jurisdiction to invalidate the binding award of the American Arbitration Association issued December 14, 1990.

Section 754(b) of the Local Agency Law states:

In the event a full and complete record of the proceedings before the local agency was made, the court shall hear the appeal without a jury on the record certified by the agency. After hearing the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter B of Chapter 5 (relating to practice and procedure of local agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence.

2 Pa.C.S. § 754. Philadelphia Civil Rule 320 contains a corresponding provision at (J)(2). Parkway points out that Common Pleas recognized that there had been a full hearing before the Review Board, as evidenced by the following statement in its finding of fact No. 16: "On January 8, 1991, *after a full hearing,* the L & I Review Board sustained Parkway's appeal from this notice, and permitted the garage to reopen." (Emphasis added.) Further, Parkway notes that at the close of the January 8, 1991 hearing

before the Review Board, the Chairman asked the City's attorney:

CHAIRMAN MOORE: Okay. Do you have any further witnesses?

MS. WOLF: No, I do not.

CHAIRMAN MOORE: Do you have any further questions of this witness?

MR. KOHN: No, sir.

CHAIRMAN MOORE: Is that the City's case?

MS. WOLF: Yes.

N.T. at 107–108.

■ We wish to note here that to the extent the City relies upon the absence of a certified record from the Review Board at the time the court proceeded with the hearing as a basis for its argument that the trial court properly held a de novo review, its reliance is mistaken. As noted earlier, when the City served its Notice of Appeal on Parkway, it failed to serve notice of the appeal on the Review Board. Because the Review Board was unaware of the appeal, a record was not certified to Common Pleas in time for its review.[16] The City does not dispute this error, but maintains that no harm was caused to the Review Board from the lack of notice because even if Common Pleas relied upon the absence of a certified record, there were valid alternative reasons for the de novo hearing. Not only did the City fail to serve notice of the appeal upon the Review Board, which would have triggered certification, but additionally, Common Pleas never requested certification of the record from the Review Board.

■ Common Pleas erroneously assumed that it had equity jurisdiction in conducting its review. Its conclusion of law No. 3 states: "A court sitting in equity has broad powers to protect the public health, safety and welfare." While this is a correct statement of the law, it is of no

16. Philadelphia Civil Rule 320 at (H)(2) provides that certification and transmission of the record before the Review Board must occur within forty days of the appeal date.

moment in the instant matter, because this action was not a proceeding in equity. The proceeding before Common Pleas was an administrative appeal and, therefore, is governed by the mandates of the legislature. This statutory scheme and the appellate review thereof has repeatedly been affirmed by our appellate courts. *See Tegzes v. Township of Bristol,* 504 Pa. 304, 472 A.2d 1386 (1984); *DeGore v. Civil Service Commission of Allegheny County,* 124 Pa.Commonwealth Ct. 375, 556 A.2d 29 (1989); *Appeal of McClellan,* 82 Pa.Commonwealth Ct. 75, 475 A.2d 867 (1984); *Rayne v. Edgewood School District,* 19 Pa.Commonwealth Ct. 353, 339 A.2d 151 (1975); *Springfield School District v. Shellem,* 16 Pa.Commonwealth Ct. 306, 328 A.2d 535 (1974).

The City argues that Common Pleas properly granted the de novo hearing because Common Pleas wanted to afford the City the opportunity to present evidence of additional different types of tests, because of the threat to the public safety and welfare, and because the judge wanted to hear the witnesses in person. The City cites to *Lawrence Township Appeal,* 117 Pa.Commonwealth Ct. 508, 544 A.2d 1070 (1988) in support of its assertion that Common Pleas did not abuse its discretion in granting the de novo hearing because of the "limited nature of the evidence before the [Review Board]." *Lawrence Township Appeal* lends no support to the City's argument. Therein, we held that the trial court correctly granted a de novo appeal on the basis that the appellants' cross examination of a particular witness at a hearing before the Lawrence Township Board of Supervisors, was improperly limited, thereby rendering the record incomplete. There was no such determination made here. Contrariwise, we concluded in *Lawrence Township Appeal* that the trial court's "assertion that after-discovered evidence constituted a second basis for finding the record 'incomplete' was incorrect." *Id.,* 117 Pa.Commonwealth Ct. at 514, 544 A.2d at 1073.

In *Springfield School District v. Shellem,* this Court addressed the issue of whether there was a "full and

complete record of the proceedings before the local agency" and, therefore, whether a de novo hearing was warranted. Quoting language from a prior case, we stated that:

> 'The crucial aspect on appeal is whether there is a complete and accurate record of the testimony taken so that the appellant is given a base upon which he may appeal, and also, that the appellate court is given a sufficient record upon which to rule on the questions presented.'

*Springfield School District v. Shellem*, 16 Pa.Commonwealth Ct. at 312, 328 A.2d at 538. Applying that criteria to the instant matter, we conclude there clearly was a full and sufficient record upon which Common Pleas could resolve the issues presented. Therefore, having concluded that a full and complete record of the proceedings was made before the Review Board, the proper scope of review for Common Pleas is set forth in 2 Pa.C.S. § 754(b). Accordingly, it is clear that Common Pleas erred in conducting a de novo review and in sua sponte re-litigating the same issues that the City had previously submitted to binding arbitration. Furthermore, the alleged "after-discovered evidence" (the "chain drag" test) [17] was not probative of the garage's structural soundness, but instead related to the spalling characteristics of the concrete.

Parkway next argues that there is substantial evidence in the record before the Review Board to support its decision. We agree. A review of the record reveals a plethora of competent evidence to support the Review Board's decision. It is uncontested that the load tests performed by Parkway and presented to the Review Board were in all respects carried out according to the standards mandated by the BOCA Code as the appropriate testing procedures. However, the City argues that its expert, Mr. Brainerd, denounced those testing procedures as unreliable.

---

17. H. Carl Walker, a structural engineer, testified for Parkway at the January 22, 1991 hearing before Common Pleas that the chain drag procedure is a method for locating areas of delamination. The procedure involves dragging a chain across the concrete while listening for a hollow sound. He stated that the method "is more of an art than a science." N.T. at 179.

Although Mr. Brainerd is entitled to his opinion, the BOCA Code, adopted by the City, is the legislated standard, which the law requires to be met. Mr. Brainerd testified that the procedure followed during the testing conformed in all respects with the procedure set out in the BOCA Code. The results of those tests show that the garage is well within the safety standards set forth in the BOCA Code. The results of those tests, along with the expert testimony of Dr. Sozen, provide overwhelming evidence in support of the Review Board's decision.

■ Next, Parkway argues that the City's appeal to Common Pleas should be quashed because the Department is not an aggrieved party and cannot appeal an adverse ruling of its own Board of Review. We disagree.

Parkway cites to *Mills Unemployment Compensation Case*, 362 Pa. 342, 67 A.2d 114 (1949) in support of its argument. That case is inapposite to the instant matter. Therein, the Department of Labor and Industry appealed from a decision of the Unemployment Compensation Board of Review, first to Superior Court and then to the Pennsylvania Supreme Court, seeking judicial guidance for future application. The court quashed the appeal, determining that the Department of Labor and Industry was not a party aggrieved, because the Department was *never* a party. The parties to the proceeding were the claimant involved and the claimant's employer.

■ In order to be considered an aggrieved party with standing to appeal, a party must be able to show a direct and substantial interest in the litigation. "[I]t is not sufficient for the person claiming to be 'aggrieved' to assert the common interest of all citizens in procuring obedience to the law." *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 192, 346 A.2d 269, 280–81 (1975). In this matter, obviously the City, being the owner of the subject garage, falls within the definition of a party aggrieved. Further, the City and the Review Board are separate entities and are not one, as Parkway contends.

Although they may both be served by the same legal department, which certainly could present questions of whether there was improper commingling of adjudicative and prosecutorial functions, no such specific allegations have been pleaded.

■■ The City presents an additional argument for our review, whether the decision of the Review Board is valid because the Review Board acted without a quorum. At the time of the proceedings, the Review Board had six members.[18] The City argues that four members were necessary to constitute a quorum and that there were only three members present on January 8, 1991, when the Review Board voted to sustain Parkway's appeal.

First we note that the City is raising this argument for the first time on appeal to this Court, having never raised it before the Board or Common Pleas. Second, there was a discussion on the record before the Review Board following one member's recusal, as to whether the City wished to proceed in the absence of a quorum. The City was asked if it wished to proceed, to which counsel responded: "Yes, sir." [19] Therefore, we conclude that the City has waived this argument.

In summary, we hold that under Section 754(b) of the Local Agency Law, 2 Pa.C.S. § 754(b), Common Pleas erred in conducting a de novo hearing. Moreover, the record before the Review Board contained overwhelming, substantial, competent evidence to support the decision to reopen the garage, subject to repair. Accordingly, we reverse the Opinion and Order of Common Pleas and reinstate the decision of the Review Board.

**18.** The Review Board is established as an appellate board pursuant to the Philadelphia Home Rule Charter, 351 Pa.Code § 3.3–100(f) and Section 5.5–1005. Pursuant to the Charter, the Board shall be composed of not less than three members, and not more than six. The Charter further provides that a majority of the members of any board or commission shall constitute a quorum. 351 Pa.Code § 8.8–408.

**19.** N.T., January 7, 1991, at 97.

## ORDER

AND NOW, this 18th day of April, 1991, the Opinion and Order of the Philadelphia County Court of Common Pleas is reversed and the decision and order of the Board of License and Inspection Review is reinstated.