IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Appeal of William Sload and : 
Karen Sload from the Decision of :
The Board of Supervisors of West :
Brandywine Township Dated : No. 887 C.D. 2017
January 19, 2017 : ARGUED: March 6, 2018
:
Appeal of: William Sload and :
Karen Sload :

BEFORE: HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE ELLEN CEISLER, Judge
HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE CEISLER FILED: April 10, 2018

William and Karen Sload (Sloads) appeal from an Order issued on June 2, 2017 by the Court of Common Pleas of Chester County (Trial Court), which dismissed the Sloads' statutory land use appeal and affirmed the Board of Supervisors of West Brandywine Township's (Board) January 19, 2017 approval of Horseshoe Pike Realty, LP's (Horseshoe) Preliminary Land Development Plan (Preliminary Plan) for a property it owns, located at 1403 Horseshoe Pike, Glenmoore, Pennsylvania (Property). We vacate the Trial Court's Order and remand this matter to the Trial Court.

The Property covers 9.4 acres and is zoned as Rural Mixed Use (RM), pursuant to West Brandywine Township's (Township) Zoning Ordinance (Zoning Ordinance).[1] On February 23, 2015, Horseshoe filed a conditional use application

_____

[1] West Brandywine Township Zoning Ordinance, Chester County, Pa. (1984).

(Application) with the Township, through which it sought approval to build a Planned Mixed Use Development upon the Property. The development would include a small residential area, as well as some open space, but would primarily contain commercial properties, including a Wawa convenience store and gas station, a CVS drug store, and an office building. The Board held an initial hearing regarding the Application on October 29, 2015, which the Sloads attended. Eight additional hearings were subsequently held, ultimately resulting in the Board's endorsement of the Application on March 17, 2016, pursuant to Section 200-37.C(1)[2] of the Zoning Ordinance and subject to 31 separate conditions of approval. The following condition is especially pertinent to this matter:

> 2. <u>Compliance with Ordinances and Regulations</u>. The Property and Proposed Development shall comply with all relevant terms and provisions of the . . . Zoning Ordinance, the West Brandywine Township Subdivision and Land Development Ordinance [(SALDO)], and all other applicable regulations, except to the extent that variances and/or waivers are granted thereto. All conditions referenced in the Findings of Fact above are additionally incorporated into this decision as conditions of approval.

Reproduced Record (R.R.) at 42a. The Board's Findings of Fact also included the following language, which was incorporated by reference into the conditions of approval:

---

[2]     C. Uses permitted by conditional use when authorized by the Board . . . in accordance with [the Zoning Ordinance's] Article XXI [Conditional Use Process]:
> (1) Planned mixed use development including multiple use of a single lot or tract and when in accordance with §§ 200-38B and 200-40. A planned mixed use development may include any use permitted by right, special exception or conditional use in accordance with this article.

Zoning Ordinance § 200-37.C-(C)(1).

[I]t shall be a condition of conditional use approval that . . . [Horseshoe] demonstrate compliance with the bulk and area requirements of [Zoning Ordinance] Section 200-40.F (and all other Zoning Ordinance requirements) during land development plan review, as a condition precedent to receiving final land development plan approval[.]

*Id.* at 25a.[3]

The Sloads did not challenge the Board's approval of the Application, and the project moved onto the next phase, in which Horseshoe submitted a Preliminary Plan to the Township, consisting of 23 sheets depicting various aspects of its development proposal, such as the overall site plan, landscaping and lighting details, erosion and sedimentation control, and storm water management. Preliminary Plan at 3-23; *see*

---

[3]     Mixed use requirements. Consistent with the purposes of this RM District and in consideration of historical and characteristic rural development patterns, any planned mixed use development on a tract or tracts exceeding five acres in gross area shall include a variety of permitted land uses. In providing for a mix of land uses and residential dwelling types, the standards set forth hereunder shall apply unless modified at the sole discretion of the Board of Supervisors as a condition of conditional use approval. The purpose of these numerical standards is to ensure that adequate lands may be set aside for a diversity of uses, including potential public and/or quasi -public uses, such as a church, community organization, post office, or fire hall, for example. The numerical standards essentially establish a range of between 35% and 65% of the net tract area that may be used for either residential or nonresidential development. There also is a limit on the amount of area that may be dedicated to larger-scale multifamily residential buildings (mainly apartment buildings), as an objective of this article is to promote a "village -like" scale of development. With the village theme, apartments over top of nonresidential uses are NOT subject to any further limitation beyond normal area, bulk and height limitations. This section does not require any applicant to develop any particular range of uses. Where, for example, only residential development is proposed, it may be permitted subject to limitation to use of 65% of the tract. The remainder may be left open or may be sold or dedicated to another party to develop for nonresidential purposes.
Zoning Ordinance § 200-40.F.

3

*also* Township's Br. at 2.[4] The Preliminary Plan was then subjected to a review process. In late 2016, Municipal Engineer Richard A. Horenburger, P.E., of McCormick Taylor sent three letters to the Township containing his recommendations. *See* Board's Findings of Fact, Discussion, Conclusions of Law, and Decision at 2 (Findings of Fact); Sloads' Br. at 19-21. In the first, dated September 6, 2016, Horenburger opined that the Preliminary Plan satisfactorily addressed all of the issues raised in McCormick Taylor's June 23, 2016 "review letter,"[5] and that McCormick Taylor had no objection to the Preliminary Plan being approved. Horenburger Letter, 9/6/16, at 1-2. This letter, however, was expressly superseded by one dated October 25, 2016, in which Horenburger, among other things, stated that Horseshoe needed to address his concerns regarding whether the Preliminary Plan complied with Sections 200-40.F(3)[6] and 200-40.F(4)[7] of the

---

[4] "The subject of this appeal . . . is the conditional subdivision and land development plan approval granted by the Board . . . on January 19, 2017 . . . Horseshoe's approved plan was prepared by Bohler Engineering PA, LLC, dated June 2, 2016, last revised August 19, 2016, consisting of 19 plan sheets[.]"

[5] This June 23, 2016 letter is not included in the case record.

[6]     No more than 65% of the net tract area of the tract or tracts undergoing development of a planned mixed use development shall be used to meet applicable area and bulk or coverage requirements for permitted nonresidential development, or to provide for purposes ancillary to such nonresidential development, including but not limited to parking, stormwater management and sewage disposal, and no land area used to satisfy such requirements shall also be used to satisfy similar requirements for any residential use. Apartment dwellings in second- and/or third-story space above permitted nonresidential uses shall be exempt from this limitation.
Zoning Ordinance § 200-40.F(3).

[7]     Area(s) developed for permitted nonresidential uses shall include land set aside at appropriate locations to be made available for public or quasi-public uses such as a day-care center, church, library, museum, educational or cultural use. No less than 15% of that portion of the tract area developed and/or allocated for permitted nonresidential uses shall be devoted to or set aside for such public or quasi-public

4

Zoning Ordinance. Horenburger Letter, 10/25/16, at 1-4. Finally, Horenburger's third letter, dated December 13, 2016, noted that Horseshoe had responded to his second letter by submitting a colorized map of the Property, and Horenburger was now satisfied that the Preliminary Plan satisfied the requirements of those two portions of the Zoning Ordinance. Horenburger Letter, 12/16/16 at 1; *see* R.R. at 274a-76a (colorized map).[8] In addition, the Township's Planning Commission evaluated the Preliminary Plan and recommended its approval on December 20, 2016, "subject to [Horseshoe's] satisfaction of all conditions identified by the [Horenburger] in [his] review letters and [Horseshoe] obtaining all required third party agency approvals." Findings of Fact at 2.[9] On January 19, 2017, the Board

use(s). Compliance with area and bulk requirements shall be calculated to include such areas, whether or not such public or quasi-public use(s) are part of initial land development plans. Building space or sites thus made available need not be dedicated but may be marketed for such purposes as would any other real estate.
Zoning Ordinance § 200-40.F(4).

[8] The Trial Court also refers to what it characterizes as a fourth letter, dated December 1, 2016. *See* Tr. Ct. Op. at 4-5. There is no such letter in the record; however, there is a December 1, 2016 email from Horenburger to Bill Rearden, P.E., of Bohler Engineering, Horseshoe's engineering firm, in which Horenburger wrote that he was responding to Rearden's "email of Nov. 17[th] with the attached exhibit representing the different usage areas of the proposed development on Horseshoe Pike" and asks Rearden to review whether the proposed Preliminary Plan complies with the Zoning Ordinance's "[a]rea and bulk regulations[.]" Horenburger Email, 12/1/16 at 1-2.

In addition, Horenburger noted in this email that Rearden had "included on [the attached] exhibit the main driveways and a portion of the stormwater management facilities as servicing quasi-public usage which falls into the percentage requirement of Zoning Ordinance 200-40(F)(3) and (4)." *Id.* at 2. Finally, Horenburger stated he agreed with Rearden that the Preliminary Plan "as shown coincides with [Horenburger's] interpretation of [those section of the Zoning Ordinance], and I will be recommending that the [Township] Planning Commission . . . approve this presentation as conforming to the Zoning Ordinance[ ]." *Id.*

[9] The formal recommendation is not in the record; however, there is a document titled "West Brandywine Township Planning Commission Minutes December 20, 2016," which provides a very cursory overview of the Planning Commission's decision-making process. Therein, it is noted that the Township received correspondence dated November 4, 2016 from Bohler Engineering, which included two items, both dated October 24, 2016 and revised on

found that the Preliminary Plan satisfied all applicable requirements of both the SALDO and the Zoning Ordinance, and approved the Preliminary Plan, though the Findings of Fact conspicuously omit any mention of Horenburger's final letter. *Id.* at 2-3.

The Sloads then appealed this decision to the Trial Court, challenging it on three bases. First, the Preliminary Plan did not comply with Section 200-40.F(3), as some of its proposed ancillary storm water management facilities are located outside the area of the Property designated for non-residential development, thereby causing the Preliminary Plan to exceed the 65% upper limit for such development in RM-zoned parcels. Tr. Ct. Op. at 5, 7-9. Second, the Preliminary Plan did not comply with Section 200-40.F(4), as less than 15% of the area marked for non-residential

---

November 1, 2016, named "Mixed Use Exhibit A" and "Mixed Use Exhibit B," as well as a December 16, 2016 letter from McCormick Taylor (presumably the one written by Horenburger). The November 4, 2016 letter from Bohler, as well as the exhibits attached thereto, are not in the record. The Planning Commission's minutes go on to say the following:

> Mr. Brion [Horseshoe's representative] was present to represent the applicant and to request a recommendation for preliminary plan approval. There was lengthy discussion on the applicant's exhibits and calculations provided to indicate compliance with [the Zoning Ordinance's] area and bulk requirements. Mr. Marburger [a Planning Commission member] requested clarification of these calculations: that areas within the non-residential area, stated to be available for quasi-public use, are not available for such use; the "open space" calculation included many features of storm water management required to be part of the non-residential calculation; and, buffers setbacks, and other features preclude any other use. These observations make the areas not available to meet the diversity requirements of Rural Mixed Use and non-residential use areas exceed the area & bulk limitations. Mr. Marburger's concerns were termed interpretations by Mr. Brion and areas of ambiguity to be weighed in favor of [Horseshoe] the applicant by Mr. Horenburger P.E., McCormick Taylor, and Mr. Brown Esq., representing [the Township]. The [Planning Commission] then voted to recommend approval [of the Preliminary Plan] to the [Board].

West Brandywine Township Planning Commission Minutes December 20, 2016 at 1-2.

6

development was to be used for public or quasi-public purposes. *Id.* at 9-11. Finally, the Board's decision was not supported by substantial evidence, in that the record before it did not support a finding that the Preliminary Plan abided by the requirements of both Section 200-40.F(3) and Section 200-40.F(4). *Id.* at 11-12. The Trial Court affirmed the Board's decision and dismissed the Sloads' statutory appeal on June 2, 2017, prompting them to file this appeal.

### Standard of Review

On appeal, local administrative agency adjudications are subject to a narrow standard of review. Where "a full and complete record of the proceedings before the local agency was made, the [trial] court shall hear the appeal without a jury on the record certified by the agency." Section 754(b) of the Local Agency Law, 2 Pa. C.S. § 754(b). "A 'full and complete record' is defined as 'a complete and accurate record of the testimony taken so that the appellant is given a base upon which he may appeal and, also, that the appellate court is given a sufficient record upon which to rule on the questions presented.'" *In re Thompson*, 896 A.2d 659, 668 (Pa. Cmwlth. 2006) (*quoting City of Phila. v. Bd. of License and Inspection Review*, 590 A.2d 79, 86 (Pa. Cmwlth. 1991)). Where such a record exists, the trial court's "review of [a final agency adjudication] is limited to determining whether constitutional rights have been violated, an error of law has been committed or findings of fact necessary to support the adjudication are not supported by substantial evidence." *Hertzberg v. Zoning Bd. of Adjustment of City of Pittsburgh,* 721 A.2d 43, 46 (Pa. 1998) (stating "[b]y 'substantial evidence' we mean such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."); *Lewis v. Civil Serv. Comm'n*, 542 A.2d 519, 522 (Pa. 1988); *see* 2 Pa. C.S. § 754(b)

(articulating appellate review standard for local agency decisions where a complete record has been provided);

Similarly, where the trial court takes no additional evidence in a zoning matter, our standard of review is restricted to determining whether the relevant local administrative agency committed an abuse of discretion, *i.e.*, made a decision not backed by substantial evidence, or an error of law. *Larsen v. Zoning Bd. of Adjustment of City of Pittsburgh*, 672 A.2d 286, 288-89 (Pa. 1996); *see also Banks v. Civil Serv. Comm'n*, 708 A.2d 890, 891 n.1 (Pa. Cmwlth. 1998) ("in order to reverse the decision of an administrative agency, [an appellate court] must conclude that the findings of the agency are totally without support in the record.").

An appellate court should be reluctant to measure and assess the multitude of factors and considerations that support a local administrative agency's decision. *See Cohen v. Zoning Bd. of Adjustment*, 276 A.2d 352, 355 (Pa. Cmwlth. 1971). Stated differently, where the reviewing court takes no additional testimony, a court should exercise self-restraint and avoid substituting its own opinions for the decision of local officials. *Id*. "It is, after all, the sole function of the [agency], in the performance of its role as fact finder, to evaluate witness credibility and assign evidentiary weight." *Lower Allen Citizens Action Grp., Inc. v. Lower Allen Twp. Zoning Hearing Bd.*, 500 A.2d 1253, 1258 (Pa. Cmwlth. 1985). Indeed, the local administrative agency "as fact finder is the ultimate judge of credibility and resolves all conflicts in the evidence," *Eichlin v. Zoning Hearing Board of New Hope Borough*, 671 A.2d 1173, 1175 (Pa. Cmwlth. 1996), and has "the power to reject even un-contradicted testimony if it finds it lacking in credibility." *Lower Allen*, 500 A.2d at 1258. Similarly, an appellate court must give substantial deference to a zoning board's reading of its own zoning ordinance, in recognition of "the

8

knowledge and expertise that a [board] possesses to interpret the ordinance that it is charged with administering." *Borough of Milton v. Densberger*, 719 A.2d 829, 831 (Pa. Cmwlth. 1998) (citations omitted). Even so, such deference is not absolute, as zoning ordinances must be interpreted in a logical and reasonable way, so as to "preserve their validity." *Council of Middletown Twp., Delaware Cty. v. Benham*, 523 A.2d 311, 317 (Pa. 1987).

## Discussion

On appeal, the Sloads raise four issues, which we summarize as follows. First, the Preliminary Plan violates Section 200-40.F(3), as some of the proposed ancillary storm water management facilities are located outside the area designated for non-residential uses, thereby causing the Preliminary Plan to exceed the 65% upper limit for non-residential development on RM-zoned parcels. Sloads' Br. at 13-15. Second, the Preliminary Plan violates Section 200-40.F(4), as it does not set aside at least 15% of the non-residential development area for public or quasi-public use. *Id.* at 16-18. The Sloads argue that, combining the part of the Property designated for non-residential development, and the portion designated for public or quasi-public use, the Preliminary Plan devotes about 85% of the Property for purposes other than residential development or open space. *Id.* Third, the Board's approval of the Preliminary Plan was not supported by substantial evidence, as there is no evidentiary basis for the Board's determination that the Preliminary Plan complies with Sections 200-40.F(3) and 200-40.F(4). *Id.* at 18-23. This is because the evidence of record shows that certain storm water facilities, which are ancillary to the portion of the Property formally designated for non-residential development, are located in the portions of the Property reserved for preservation as open space, meaning that more than 65% of the Property would actually be developed for non-

9

residential purposes. *Id.* at 20-22. In addition, the evidence of record does not show that 15% of the non-residential development area will be reserved for public or quasi-public use; instead, it shows that the public or quasi-public use region is in an adjacent part of the Property, meaning that non-residential development will effectively cover roughly 85% of the Property. *Id.* at 22-23. Finally, Sections 200-40.F(3) and 200-40.F(4) are not ambiguously worded, and thus their terms should be read according to their plain meaning, and should not be liberally construed in favor of Horseshoe, the landowner. *Id.* at 23-26.

The Township responds in opposition with several counter-arguments, which we have reworded and summarized for clarity. First, the Preliminary Plan complies with Section 200-40.F(3), as the storm water management facilities located outside the non-residential areas of the Property will not aid storm water control inside those areas. Township's Br. at 7-9. Thus, these facilities were correctly not counted towards the 65% upper limit on non-residential development. *Id.* Second, the Preliminary Plan complies with Section 200-40.F(4). This is because the colorized map shows that more than 15% of the non-residential area is reserved for public or quasi-public use, and the Zoning Ordinance does not require all space reserved for public or quasi-public use be considered as non-residential in nature, as public or quasi-public use is a category of land use separate from residential or non-residential. *Id.* at 9-12. Third, the Board's approval of the Preliminary Plan was supported by substantial evidence, because numerous Township agencies and employees spent significant amounts of time reviewing Horseshoe's development proposals for the Property, all of which gave their approval, and because the Township, having spent several months monitoring the project, was ultimately satisfied regarding Horseshoe's compliance with the Zoning Ordinance. *Id.* at 12-

10

13. Finally, if Sections 200-40.F(3) and 200-40.F(4) of the Zoning Ordinance are found to be ambiguous, they must be liberally construed in favor of Horseshoe, the Property's owner, which therefore justifies the Board's interpretations of these provisions as applied in this matter. *Id.* at 13.

Horseshoe also challenges this appeal by making arguments that are substantially similar to the Township's, with two minor additions. First, Horseshoe notes that the Sloads had the option to provide the Board with competing expert testimony regarding interpretation of the Preliminary Plan, but chose not to do so. Horseshoe's Br. at 14. Second, Horseshoe contends the Preliminary Plan complies with Section 200-40.F(4), because it allocates 17.6% of the non-residential area for public or quasi-public use, as well as an additional 18.5% of the overall Property to public or quasi-public use. *Id.* at 16.

Preliminarily, we hold that neither Section 200-40.F(3) nor Section 200-40.F(4) of the Zoning Ordinance is ambiguously worded, and therefore each provision must be interpreted according to its plain language.

> Like statutes, the primary objective of interpreting ordinances is to determine the intent of the legislative body that enacted the ordinance. *See Bailey v. Zoning Bd. of Adjustment of City of Phila.*, 569 Pa. 147, 801 A.2d 492 (2002). Where the words in an ordinance are free from all ambiguity, the letter of the ordinance may not be disregarded under the pretext of pursuing its spirit. 1 Pa. C.S. § 1921; *see also* 1 Pa. C.S. § 1903 (words and phrases in a statute shall be construed in accordance with their common and accepted usage). An ambiguity exists when language is subject to two or more reasonable interpretations and not merely because two conflicting interpretations may be suggested. *New Castle County v. Hartford Accident & Indem. Co.*, 970 F.2d 1267 (3d Cir.1992).

11

*Adams Outdoor Advert., LP v. Zoning Hearing Bd. of Smithfield Twp.*, 909 A.2d 469, 483 (Pa. Cmwlth. 2006). As noted above, Section 200-40.F(3) of the Zoning Ordinance states:

> No more than 65% of the net tract area of the tract or tracts undergoing development of a planned mixed use development shall be used to meet applicable area and bulk or coverage requirements for permitted nonresidential development, or to provide for purposes ancillary to such nonresidential development, including but not limited to parking, storm-water management and sewage disposal, and no land area used to satisfy such requirements shall also be used to satisfy similar requirements for any residential use. Apartment dwellings in second and/or third story space above permitted nonresidential uses shall be exempt from this limitation.

Zoning Ordinance § 200-40.F(3).  Section 200-40.F(4) of the Zoning Ordinance reads:

> Area(s) developed for permitted nonresidential uses shall include land set aside at appropriate locations to be made available for public or quasi-public uses such as a day-care center, church, library, museum, educational or cultural use. No less than 15% of that portion of the tract area developed and/or allocated for permitted nonresidential uses shall be devoted to or set aside for such public or quasi -public use(s). Compliance with area and bulk requirements shall be calculated to include such areas, whether or not such public or quasi-public use(s) are part of initial land development plans. Building space or sites thus made available need not be dedicated but may be marketed for such purposes as would any other real estate.

Zoning Ordinance § 200-40.F(4).  Both provisions offer clear and delineated requirements that, as applied here, do not leave room for open interpretation: No more than 65% of the entire Property may be occupied by non-residential development, a percentage that must factor in all ancillary features, such as the storm

12

water management facilities assisting that portion of the Property, and at least 15% of the Property's non-residential area must be reserved for public or quasi-public uses.

We agree with the Sloads that substantial evidence does not exist to support the contention that the Preliminary Plan complies with Section 200-40.F(3) of the Zoning Ordinance. Incredibly, the Board's Findings of Fact do not contain a conclusion regarding whether the Preliminary Plan satisfies the Zoning Ordinance's requirements, merely declaring that it "comports with the applicable provisions of the . . . Township SALDO" and then approving the Preliminary Plan, subject to 21 conditions. *See* Findings of Fact at 3-8. Moreover, even if we were to ignore this omission, the record evidence does not compel a different conclusion regarding Section 200-40.F(3) of the Zoning Ordinance. Horseshoe's colorized map displays the following breakdown for the Preliminary Plan's manner of divvying up the Property:

> 1. Area of Net Tract for Nonresidential Development[:] 64.9%
>
> 2. Area within Nonresidential Development for Public or Quasi Public Use[:] 17.6%
>
> 3. Area of Nonresidential Development for Public or Quasi Public Use[:] 18.5%
>
> 4. Area of Net Tract for Residential Development[:] 3.2%
>
> 5. Remainder of Net Tract Area to be Left Open[:] 19.9%

R.R. at 276a. Thus, adding the first and third categories together (each of which covers a separate and distinct part of the Property), the Preliminary Plan, on its face, calls for non-residential development that would consume 83.4% of the entire

13

Property.[10]  In addition, the overall numbers cannot be correct, for when the first, third, fourth and fifth categories are added together, the total land use percentage is 106.5%.[11]

Both Horseshoe and the Township argue that the Zoning Ordinance does not require the portions of the Property reserved for public or quasi-public use to be deemed non-residential in nature; however, this reading of the Zoning Ordinance is illogical and unsupportable.  We base this conclusion upon four sections of the Zoning Ordinance: 200-40.F, 200-40.F(1), 200-40.F(3), and 200-40.F(4).  Section 200-40.F of the Zoning Ordinance declares, in pertinent part:

> Consistent with the purposes of this RM District and in consideration of historical and characteristic rural development patterns, any planned mixed use development on a tract or tracts exceeding five acres in gross area shall include a variety of permitted land uses. In providing for a mix of land uses and residential dwelling types, the standards set forth hereunder shall apply unless modified at the sole discretion of the Board of Supervisors as a condition of conditional use approval. The purpose of these numerical standards is to ensure that adequate lands may be set aside for a diversity of uses, including potential public and/or quasi-public uses, such as a church, community organization, post office, or fire

---

[10] The second category, "Area within Nonresidential Development for Public or Quasi Public Use," was not counted towards this total, as it is merely a subset of the first category.

[11] Both Horseshoe and the Trial Court separately made another basic mathematical error with regard to the Preliminary Plan's overall amount of area reserved for public or quasi-public use.  Each added the second and third categories together, and concluded the Preliminary Plan calls for 36.1% of the Property to be used for public or quasi-public purposes. *See* Tr. Ct. Op. at 9; Horseshoe's Br. at 16.  This is incorrect.  As shown by the colorized map itself, the second category reflects the percentage of the first category that has been marked for public or quasi-public use (*i.e.*, 17.6% of 64.9%), *not the percentage of the entire Property*.  Therefore, taking this into account, the land inside the first category's area for public or quasi-public use purportedly covers approximately 11.42% of the overall Property.  Adding this to the third category, the result is that the colorized map indicates the Preliminary Plan reserves roughly 29.92% of the Property for public or quasi-public use.  Of course, this figure cannot be correct either, for, as already discussed, the individual percentages displayed on this map are themselves inaccurate.

14

hall, for example. The numerical standards essentially establish a range of between 35% and 65% of the net tract area that may be used for either residential or nonresidential development. There also is a limit on the amount of area that may be dedicated to larger-scale multifamily residential buildings (mainly apartment buildings), as an objective of this article is to promote a "village-like" scale of development. With the village theme, apartments over top of nonresidential uses are NOT subject to any further limitation beyond normal area, bulk and height limitations. This section does not require any applicant to develop any particular range of uses. Where, for example, only residential development is proposed, it may be permitted subject to limitation to use of 65% of the tract. The remainder may be left open or may be sold or dedicated to another party to develop for nonresidential purposes.

Zoning Ordinance § 200-40.F. Section 200-40.F(1) states:

No more than 65% of the net tract area of the tract or tracts undergoing development of a planned mixed use development shall be used to meet applicable area and bulk or coverage requirements for permitted residential development or to provide for purposes ancillary to such residential development, including but not limited to parking, stormwater management and sewage disposal, and no land area used to satisfy such requirements nor applicable open space requirements shall also be used to satisfy similar requirements for any nonresidential use. Apartment dwellings in second - and/or third-story space above permitted nonresidential uses shall be exempt from this limitation.

Zoning Ordinance § 200-40.F(1). When the plain language of these two sections is read in conjunction with that of the remaining two, it becomes clear that, while there are a multitude of different permissible uses under the Zoning Ordinance for RM-zoned land, there are only two recognized types of development: Non-residential and residential. Additionally, per these Zoning Ordinance provisions, public or

15

quasi-public uses are a form of non-residential development, and thus any areas so designated must be counted towards the overall 65% cap.

Furthermore, it is entirely unclear how Horenburger could have concluded that the storm water management facilities located outside the non-residential areas of the Property should not be considered as ancillary thereto. While the Preliminary Plan, in conjunction with Horseshoe's colorized map, provides great assistance in understanding how Horseshoe desires to develop the Property, *nothing* in the record shows that the storm water management facilities located outside the non-residential areas of the Property necessarily assist in handling rain, runoff, *et cetera* from only the residential or open space areas of the Property. Instead, though the Preliminary Plan depicts the locations of wetlands, water basins, drainage culverts, rain gardens, walls, and level spreaders in various parts of the Property marked for non-residential or residential development, or for preservation as open space, it does so without illuminating how water falling upon each of these areas will somehow respect invisible boundary lines and flow only to management facilities located in the "right" locations. Therefore, we conclude the record does not contain substantial evidence showing the Preliminary Plan satisfies the requirements of Section 200-40.F(3) of the Zoning Ordinance.

We also agree with the Sloads that the record is devoid of substantial evidence showing the Preliminary Plan complies with Section 200-40.F(4) of the Zoning Ordinance. As previously noted, the Board did not offer a conclusion in its Findings of Fact regarding whether the Preliminary Plan complies with all of the Zoning Ordinance's pertinent provisions. *See* Findings of Fact at 3-8. Nor does the record include evidence showing such compliance. Horseshoe's colorized map shows a cross-hatched region, which is purportedly earmarked for public or quasi-public use

16

and covers 17.6% of the Property's non-residential development area.  R.R. at 276a.  In his December 1, 2016 email to Bill Rearden, P.E., of Bohler Engineering, the engineering firm which created the Preliminary Plan itself, Horenburger writes, in relevant part:

> I note that you have included on your exhibit the main driveways and a portion of the stormwater management facilities as serving quasi-public usage which falls into the percentage requirement of Zoning Ordinance 200-40(F)(3) and (4).  I concur that your application plan as shown coincides with my interpretation of that ordinance[.]

Horenburger Email, 12/1/16, at 2.  The "exhibit" Horenburger refers to was apparently attached to an email sent by Rearden on November 17, 2016, *id.* at 1, but neither Rearden's email nor the referenced exhibit are in the record. In its brief, the Township appears to expand upon the thesis of Horenburger's email, without actually citing or quoting it, and discusses the particulars of the cross-hatched map section, arguing that it has been properly deemed as being reserved for public or quasi-public use:

> This area includes a portion of the stormwater management facilities associated with the public/quasi-public uses (the parking, preservation of the barn as an historic resource and open space areas), road/driveway access to the public/quasi-public uses, and reflects the improvements alleviating traffic conditions associated with the abutting road intersection.
>
> It merits emphasis that addressing stormwater management is a particular public or quasi -public concern - given the Pennsylvania Department of Environmental

17

> Protection mandates for increased stormwater controls and the newly imposed nitrogen and phosphorus nutrient reduction requirements.

Township's Br. at 9-10.

These contentions, however, are extremely suspect. Though Horenburger expressed his agreement with Rearden that the main driveways and certain, unspecified pieces of the Property's storm water management system qualified as being for public or quasi-public use, he did so in a perfunctory manner, without offering any real explanation as to why this was the case. Moreover, even if Horenburger had provided us with insight into his thought process, we are skeptical his reading of Section 200-40.F(4) would pass muster, given that this provision offers "a day-care center, church, library, museum, educational or cultural use" as representative examples of uses which are public or quasi-public in nature. Thus, we agree with the Sloads that the record does not contain substantial evidence showing the Preliminary Plan complies with Section 200-40.F(4) of the Zoning Ordinance.

Consequently, we vacate the Trial Court's June 2, 2017 Order and remand this matter to the Trial Court. We direct the Trial Court to promptly issue an order consistent with this opinion, vacating the Board's January 19, 2017 approval of the Preliminary Plan and directing the Board to conduct additional fact-finding, as well as a thorough re-review of the Preliminary Plan, culminating in the issuance of amended findings of fact and conclusions of law. Therein, the Board must explain, in detail and with recognition of this opinion's conclusions, how the Preliminary Plan does or does not meet the requirements set forth by Sections 200-40.F(3)  and

200-40.F(4) of the Zoning Ordinance, as well as all other applicable sections of the Township's Zoning Ordinance and SALDO.

_____
ELLEN CEISLER, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Appeal of William Sload and   :
Karen Sload from the Decision of   :
The Board of Supervisors of West   :
Brandywine Township Dated   :  No. 887 C.D. 2017
January 19, 2017   :
   :
Appeal of: William Sload and   :
Karen Sload   :

## O R D E R

AND NOW, this 10th day of April, 2018, the Order of the Court of Common Pleas of Chester County, dated June 2, 2017, is hereby VACATED. It is FURTHER ORDERED that this matter is REMANDED to the Trial Court for disposition per the terms of this Opinion.

Jurisdiction relinquished.

_____
ELLEN CEISLER, Judge